J.A. SHULTS, et al.

v.

## CHAMPION INTERNATIONAL CORPORATION.

No. CIV–2–91–33.

United States District Court,
E.D. Tennessee,
at Greeneville.

Jan. 26, 1993.

Gary E. Brewer, Gary E. Brewer, PC, Morristown, TN, W. Gordon Ball, Knoxville, TN, Wade C. Hoyt, III, Hoyt, MacCleod, Callen, Sproles & Slade, Rome, GA, Thomas C. Jessee, Jessee & Jessee, Johnson City, TN, Herbert S. Moncier, Knoxville, TN, Don

Barrett, Lexington, MS, Paul E. Merrell, Bradley & Merrell, Tidewater, OR, Gary A. Davis, Knoxville, TN, for plaintiffs.

W. Kyle Carpenter, Diane Marie Messer, Louis C. Woolf, Baker, Worthington, Crossley, Stansberry & Woolf, Knoxville, TN, Sheila L. Birnbaum, Barbara Wrubel, Katherine Armstrong, Skadden, Arps, Slate, Meagher & Flom, New York City, for defendant.

## ORDER

HULL, District Judge.

This is a class action for interference with property rights brought by riparian landowners on the Pigeon River and Douglas Lake in Cocke, Jefferson and Sevier Counties of Tennessee. The attorneys for the parties have negotiated a settlement agreement which has been submitted to the Court for approval. On January 19, 1993, after notice of the proposed settlement had issued to class members, the Court conducted a fairness hearing. Based upon the written objections signed by sixty-one (61) class members, the testimony at the fairness hearing, and the Court's personal assessment of the proposed agreement, the Court has decided not to approve the settlement.

The plaintiff class, composed of approximately two thousand, six hundred (2,600) riparian landowners and lessees, claimed that Champion's pulp and paper mill in Canton, North Carolina, discharges waste water into the Pigeon River which contains many toxic chemicals; that its paper-making process also discolors the river's water and makes it foul-smelling; that Champion's use of the river constitutes a private nuisance that unreasonably interferes with their rights as riparian property owners; and that this use is also a trespass contaminating their land and usable water. The plaintiffs sought damages to compensate for the diminution in the market value, rental value and/or use value of their realty, including compensation for the personal discomfort, stress, annoyance, and anxiety associated with this contamination of the river and lake water and their riparian properties. They also sought punitive damages and injunctive relief which would prohibit Champion from using lead, cadmium, cyanide, arsenic, elemental chlorine and chlorinated compounds in its mill processes.[1]

The case came to trial on September 14, 1992. On October 16, 1992, the Court declared a mistrial after the jury had announced that it was unable to reach a unanimous verdict.[2] On December 21, 1992, attorneys for the parties entered into the settlement agreement now before the Court.

The proposed settlement provides for Champion to pay Six and One-Half ($6.5) Million Dollars into an interest bearing account which, after payment of the plaintiffs' litigation fees and expenses, will be used to establish a charitable fund to benefit the landowners and their communities, through environmental, educational, or other charitable activities. No compensatory or punitive damages are to be paid directly to any of the class members and no injunctive relief is to be imposed upon Champion.

The agreement not only settles the class action claims against Champion but would release Champion from liability for,

> all future claims, demands, rights of action and causes of action of every kind and character, whether arising in law or equity, both against the Settling Defendant and all other persons and entities, which each Class member, his, her or its heirs, executors, administrators, successors, and assigns, ever had, now have or hereafter may acquire, by reason of, arising out of, or in any way relating to Champion's Discharge [of waste water from its pulp and paper mill in Canton, North Carolina, into the Pigeon River and Douglas Lake].

---

1. There were other tort theories raised in the original complaint, such as fear of cancer, but these were dismissed early in the proceedings. The pretrial order, which supplanted the pleadings, limited the action to one sounding in trespass and nuisance. At no time was any claim raised for a physical injury such as cancer based on exposure to toxic chemicals in the waters of the river or the lake.

2. Only two of the eight jurors were in favor of a plaintiffs' verdict.

The agreement entails the creation of The Pigeon River Endowment Fund which would be managed, invested, and administered by the already-existing East Tennessee Corporation, a tax exempt, nonprofit corporation organized under Tenn.Code Ann. § 48–52–103. The general purpose of the fund is to benefit, through environmental, educational, or other charitable activities including community or industrial development, not only those landowners who chose to be class members in this lawsuit but all landowners along the river and lake and their communities in Cocke, Sevier and Jefferson Counties. The Foundation is to establish a Board of Advisors of the Pigeon River Endowment Fund from the Pigeon River and Douglas Lake communities (not necessarily composed of class members), but is to retain control over the distribution of the funds. The document establishing the endowment specifically states its intention that the fund be continued in perpetuity. Presumably, disbursements to class members would be made only from the net income of the fund.

The objections raised by class members fall into several broad categories. Many members voiced disapproval of the fact that the settlement would allow for payment of the plaintiffs' attorneys but would not put any money directly into the pockets of the landowners.

Other objections focused on the fact that Champion accepts no blame for its long-term pollution of the river and is not being enjoined from polluting it in the future. Not surprisingly, many thought the settlement would give Champion a license to pollute in the future, free from any objection by those living downstream.

Even more serious objections focussed on the fact that the lawsuit was tried as one for trespass and nuisance, but the settlement would settle any claim for personal injuries which class members may now have or may learn about in the future. Several people pointed out that they only recently learned of the possible dioxin contamination of their properties and speculated that there might be other toxic agents in the river or the lake about which they still know nothing. In addition, despite assurances to the contrary by the attorneys for both parties, the agreement precludes lawsuits based on possible future misconduct on Champion's part, rather than just barring claims based on conduct prior to the effective date of the agreement.

In evaluating the fairness, reasonableness, and adequacy of the proposed settlement, the Court has considered 1) the complexity, expense, and likely duration of the litigation; 2) the factual and legal obstacles to a verdict in favor of the class; 3) the possible range of recovery and certainty of damages; 4) the number of objectors to the settlement and the nature of their objections; and 5) the impact the settlement might have on the community.

Because the proof in this lawsuit had to be presented through numerous expert witnesses, the litigation was both lengthy and expensive. In addition, the many complicated legal issues and evidentiary questions raised in this action guarantee that any verdict would have to be appealed. Nevertheless, retrial is not impossible. All of the expert testimony in this case was videotaped and could be used in a second trial to minimize expert witness fees. Further, all evidentiary questions have already been resolved and attorneys for both sides of the case know exactly what evidence will be admitted into trial. A retrial would likely be shorter and less costly than the first trial. Finally, other law firms have expressed interest in the lawsuit and may be able to contribute money and expertise to a retrial. The Court does not find the length, complexity, or expense of this case prohibitive.

The Court is aware of no legal obstacles to a plaintiffs' verdict. In the first trial of this case, none of the representative plaintiffs demonstrated evidence of substantial property damage. However, they did have credible proof of stress, annoyance, and anxiety caused by the contamination of their water. It was obvious to the Court that any hope the class might have had of obtaining a sizeable verdict depended on the availability of punitive damages. Unfortunately for the plaintiffs' case, most of the evidence of reprehensible conduct on Champion's part fell outside the statute of limitations. In the three-year period which preceded the filing of this law-

suit, the evidence showed that Champion not only stopped discharging dioxin into the Pigeon River, but embarked upon a major effort to redesign its manufacturing procedures to greatly reduce the odor and color pollution of the river. There was evidence that the water which borders the plaintiffs' properties was much more polluted when they acquired their land than it is today. Moreover, the evidence showed that Champion's discharges used to be regulated by the State of North Carolina (apparently with little concern for the people downstream in Tennessee), but are now monitored more evenhandedly by the federal Environmental Protection Agency. All these factors decrease the likelihood of a large punitive damages award. Nonetheless, the plaintiffs' case had moral strength. The undisputed evidence was that, for a great many years, Champion used the Pigeon River as its private sewer. The color contamination, which limited the depth to which light could penetrate the waters and greatly impaired normal aquatic life, and the smell associated with Champion's discharge, were obvious to even the most casual observer. Less obvious and more sinister was the fact that, historically, many toxic chemicals were released into the river with no warning to persons living downstream and no concern for possible damage to the ecosystem. The plaintiffs' outrage at this insult is justifiable and, in the Court's opinion, could support an award of punitive damages even though Champion's conduct today appears to be reasonable, and even though there is reason to believe that future contamination of the river will be held to a legal minimum.

As indicated earlier, the number of objectors is not great, but it is by no means insignificant. The objections they raise are serious ones.

Naturally, some class members objected to the fact that the only people getting any direct financial advantage from the settlement were the attorneys for the plaintiffs. However, this is not necessarily inappropriate. Only the attorneys for the plaintiffs advanced personal funds to finance the lawsuit. It is not unreasonable that some of the settlement funds be used to pay for the costs of this litigation.

In addition, while the class members may not know this, it is typical of settlement agreements that no liability be admitted by any party. This language does not disturb the Court. The Court agrees with the class members that the language of the settlement appears to give Champion a license to pollute the Pigeon River. However, the only real license given to Champion is the NPDES permit which controls and limits its waste water discharges. The Court believes that the Environmental Protection Agency will monitor Champion's activities and protect the interests of the class.

The objection which is of the gravest concern to the Court has to do with the language of the release. In the original notice of the class action sent out to all riparian property owners, the potential class members were advised,

> The class action seeks damages both for loss of value of the land and for other incidental damages attributable to the land use.... If you do not ask to be excluded, you will continue to be a part of the class, and will be bound by the Court's final decision whether Plaintiff wins or loses.

The Court is satisfied that, as of the date the class closed, those who had not opted out could be precluded from bringing a separate cause of action, such as a personal injury claim, about any condition known to them at that time. However, the Court is confidant that those who passively remained in the class had no idea that any outcome of the lawsuit could possibly preclude them (and their children and grandchildren), from ever bringing a lawsuit against Champion that "in any way related" to Champion's discharges. This release language used in the proposed settlement is peculiarly suited to lawsuits arising out of discrete events such as accidental spills of toxic material. It does not strike the Court as appropriate in a lawsuit concerning continuing conduct that might well vary in its intensity or degree. Moreover, the toxic chemicals to which the class members where exposed were not made known to them in a timely fashion. Fears that, at some future date, we may discover

**524**

additional harm from agents in the water, do not seem unfounded. No settlement that precludes future, unknown causes of action can be considered fair, reasonable, or in the best interests of the class as a whole.

The final factor which the Court considered is the impact this settlement would have upon the community. There is no question that a trust fund, which could be drawn upon by all members of the community, could be highly beneficial. If it did nothing more than make a college education available to all the youth of this area, the long term salutary impact on the community would be impressive. However, this benefit has to be weighed against the disheartening and even demoralizing effect upon the community of the knowledge that its only lawsuit to redress over eighty years of harm (and possible future harm) to an important environmental asset ended with the impaired parties receiving no direct compensation for the loss they have sustained.

When all of these factors are carefully weighed, the Court must reject the settlement as now proposed.

This does not mean that the parties are forced to retry this action. The Court would, in fact, welcome a settlement agreement if one could be fashioned that met the concerns expressed in this Order. The parties are advised that, based on the meager evidence of actual damages presented at the first trial, the fact that Champion's conduct in recent years has been much more responsible to its downstream neighbors, and the fact that Champion's discharges are now subject to federal regulation, a settlement in the amount of Six and One–Half ($6.5) Million Dollars would be approved.

The Court would also approve release language that barred all trespass and nuisance claims based on known conduct prior to the effective date of the settlement and barred any class member's personal injury claim arising prior to the date the class was closed.

The Court would allow twenty percent (20%) of the settlement monies to be used for attorneys' fees and, in addition, would reimburse the plaintiffs' out-of-pocket litigation expenses from the fund.

The balance of the settlement fund would be distributed directly to the class members. The Court does not think placing the money in an endowment fund would be fair to the class for several reasons. For one thing, it is difficult to envision ways to spend the monies that would proportionately benefit all the members of the class. For another, the class members entered into this litigation with the idea that they would recover money damages for the "loss of value of the land and for incidental damages attributable to land use." They should not have their modest recovery involuntarily placed in a charity even if the charity would be beneficial to the community.

In the event that a settlement is reached, the Court would appoint a Master, pursuant to Rule 53, Federal Rules of Civil Procedure, to devise an equitable formula for distribution of the monies and to handle the actual disbursements to the class members.

If no acceptable settlement proposal is offered to the Court by August 1, 1993, the case will be reset for trial on September 7, 1993.