MARISOL A., by her next friends, Rev. Dr. James Alexander FORBES, Jr., and Raymunda Cruz; Lawrence B., by his next friend, Dr. Vincent Bonagura; Thomas C., by his next friend, Dr. Margaret T. McHugh; Shauna D., by her next friend, Nedda De Castro; Ozzie E., by his next friends, Jill Chaifetz and Kim Hawkins; Darren F. and David F., by their next friends, Juan A. Figueroa and Rev. Marvin J. Owens; Bill G. and Victoria G., by their next friend, Sister Dolores Gartanutti; Brandon H., by his next friend, Thomas J. Moloney; and Steven I., by his next friend, Kevin Ryan, on their own behalf and on behalf of all others similarly situated, Plaintiffs,

and

Danielle J., by her next friend, Angela Lloyd; and Richard and Walter S., by their next friends, W.N. and N.N., on behalf of themselves and all others similarly situated, Intervening Plaintiffs,

v.

Rudolph W. GIULIANI, Mayor of the City of New York; Jason Turner, Administrator of the Human Resources Administration and Commission of the Department of Social Services of the City of New York; Nicholas Scoppetta, Commissioner of the New York City Administration for Children's Services; George E. Pataki, Governor of the State of New York; and John Johnson, Commissioner of the New York State Office of Children and Family Services, Defendants.

and

Shirley Wilder; Thomas Edwards; Sharon Rodwell; Barry Parker, by his mother and next friend, Madeline Butler; Robin Herbert, by her mother and next friend Nancy Herbert; Shedrick Roberts, by his mother and next friend Annie Roberts;

Christopher Torian, by his mother and next friend Lillian Torian, on their own behalf and on behalf of all others similarly situated; Dr. Kenneth Clark; Rev. Howard Moody; Dr. Richard Cloward; and Mildrid Davis, Plaintiffs,

and

Blanche Bernstein, individually and as Administrator of the New York City Human Resources Administration; The New York City Department of Social Services; Beverly Sanders, individually and as Administrator of Special Services for Children; Carol Parry; Elizabeth Beine; Linda Marino, individually and as Director of the Office of Allocations and Accountability of Special Services for Children; Harrison Golden as Comptroller of the City of New York; Lester Kaufman, individually and as Executive Director of Ohel Children Home, Defendants.

Abbott House, Berkshire Farm Center & Services for Children, Brooklyn Home for Children, Brookwood Child Care, Episcopal Mission Society, Green Chimneys Children's Service, Heartsease Home, Inc., Inwood House, Lakeside School, Louise Wise Services, Lutheran Community Services, Puerto Rican Family Association, St. Christopher–Jennie Clarkson Child Care Services, Sheltering Arms Children's Service, Society for Seaman's Children, Spence–Chapin Services to Children, Talbot Perkins Children Services, The Children's Aid Society, and The Children's Village, Intervenors.

Nos. 95 Civ. 10533 RJW, 78 Civ. 957 RJW.

United States District Court, S.D. New York.

March 31, 1999.

Children's Rights, Inc., New York City, Marcia Robinson Lowry, Susan Lambiase, of counsel, Lawyers For Children, New York City, Karen Freedman, of counsel, Cahill Gordon & Reindel, New York City, Thomas F. Curnin, of counsel, Schulte Roth & Zabel, New York City, David M. Brodsky, of counsel, for plaintiffs.

Michael D. Hess, Corporation Counsel of the City of New York, New York City, Gail Rubin, John Woods, Grace Goodman, of counsel, for city defendants.

Eliot Spitzer, Attorney General of the State of New York, New York City, Judith T. Kramer, Steven M. Connolly, William H. Bristow, III, of counsel, for state defendants.

## OPINION

WARD, District Judge.

On December 1, 1998, defendants Rudolph Giuliani, Mayor of the City of New York, Jason Turner, Administrator of the Human Resources Administration and Commissioner of the Department of Social Services of the City of New York, and Nicholas Scoppetta, Commissioner of the New York City Admin-

istration for Children's Services ("City defendants") and the plaintiff class in *Marisol A. v. Giuliani* ("*Marisol* plaintiffs" or "plaintiffs") entered into a settlement agreement ("*Marisol* City Settlement Agreement" or "City Settlement Agreement"). That same date, defendants George E. Pataki, Governor of the State of New York and John Johnson, Commissioner of the New York State Office of Children and Family Services ("State defendants") and the *Marisol* plaintiffs entered into a settlement agreement ("*Marisol* State Settlement Agreement" or "State Settlement Agreement" and the agreements are collectively referred to as "Settlement Agreements"). The parties move to have these Settlement Agreements approved by this Court and for the entry of an order dismissing the claims in *Marisol*. Further, City defendants and plaintiffs in the *Wilder v. Bernstein* class action ("*Wilder* plaintiffs") move for the dismissal of the *Wilder* class action. Pursuant to Federal Rule of Civil Procedure 23(e), the Court approves the Settlement Agreements, dismisses the claims raised in *Marisol* and dismisses *Wilder*.

## BACKGROUND

### I. HISTORY OF *WILDER* AND *MARISOL* LITIGATION

Since the 1970s, this Court has presided over litigation concerning the New York City foster care system. In June 1973, *Wilder v. Sugarman*, 73 Civ. 2644(HRT), was filed in the Southern District of New York. Six named children brought a class action against various child care agencies, and City and State agencies and officials responsible for the care of New York City foster children. Plaintiffs asserted that the statutory scheme for the provision of child-care services, and the manner in which those services were provided, violated the first, eighth and fourteenth amendments, and resulted in racial and religious discrimination in the access to these services.

In March 1978, a new action, *Parker v. Bernstein*, 78 Civ. 957(RJW), was filed which raised similar challenges to the religiously based New York City child care system.

This Court, in a June 2, 1978 Order, dismissed *Wilder v. Sugarman* without prejudice. Subsequently, *Parker v. Bernstein* was amended and renamed *Wilder v. Bernstein*. See *Wilder v. Bernstein*, 499 F.Supp. 980, 986–87, n. 4 (S.D.N.Y.1980). A class was certified in 1980 and defined as: "all those New York City children who are black, and who are Protestant, of other non-Catholic or non-Jewish faiths, or are of no religion, and are in need of child-care services outside their home." *Wilder v. Bernstein*, 499 F.Supp. at 994.

Before trial was to begin in August 1983, the *Wilder* plaintiffs and City defendants entered into settlement negotiations. In April 1984, an initial draft of a Stipulation of Settlement was presented to this Court for approval. At that time, the Court heard objections from nineteen contract child care agencies, and in June 1984 permitted them to intervene ("*Wilder* Intervenors" or "Intervenors"). The Intervenors objected to the initial draft Stipulation of Settlement's focus on discrimination rather than on the best interests of all children in foster care. The Intervenors' concerns were addressed on the record during further settlement negotiations and the Stipulation of Settlement was amended.

On October 8, 1986, the Stipulation of Settlement as amended was approved by this Court ("Stipulation of Settlement").[1] *Wilder v. Bernstein*, 645 F.Supp. 1292 (S.D.N.Y. 1986). A final judgment was entered on April 29, 1987 approving the Stipulation of Settlement. Subsequently, a number of foster care agencies which had been dismissed as defendants appealed the judgment. In June 1988, the Second Circuit affirmed this Court's approval of the Stipulation of Settlement. *Wilder v. Bernstein*, 848 F.2d 1338 (2d Cir.1988).

Under the terms of the Stipulation of Settlement, the City was required to place children in foster care in a nondiscriminatory manner, as to race and religion. The foster children were to be placed on a "first-come, first-served basis" in the best available program. Further, the children were to be eval-

---

1. The Stipulation of Settlement dismissed the State defendants from the action.

uated "in accordance with good social work practice, to determine (1) the specific service needs of the child and (2) the level of care, and the specific type of program required by the child." The Stipulation of Settlement provided that these evaluations be conducted prior to placement and in the case of pre-evaluation placements, no longer than 30 days after placement. To determine the best available program, the Stipulation of Settlement required that the City hire a consultant to categorize and rate the quality of foster care programs.

The Stipulation of Settlement also included provisions regarding vacancies, waiting lists, and therapeutic objections to regulate the placement of children. To monitor compliance with the terms of the Stipulation of Settlement, the Stipulation provided for a three-member settlement panel ("*Wilder* Settlement Panel") and support staff.[2]

On December 3, 1995, while post-judgment enforcement continued in *Wilder*, eleven named plaintiffs brought the *Marisol* action against City and State officials responsible for administering and monitoring New York City's Child Welfare Administration ("CWA"), now the Administration for Children's Services ("ACS"), claiming that the defendants' actions or inactions deprived plaintiffs of their rights under a diverse array of federal and state laws, including the First, Ninth, and Fourteenth Amendments to the United States Constitution; Article XVII of the New York State Constitution; the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 620–628, 670–679a; the Child Abuse Prevention and Treatment Act, 42 U.S.C. §§ 5101–5106a; the Early and Periodic Screening, Diagnosis and Treatment program of the Medicaid Act, 42 U.S.C. §§ 1396a, 1396d(a) & (r); the Multiethnic Placement Act of 1994, 42 U.S.C. § 622(b)(9); the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq.; the Rehabilitation Act of 1973, 29 U.S.C. §§ 794, 794a; the New York State Social Services Law Articles 2, 3,

6 & 7; the New York State Family Court Act, Articles 6 & 10; and various state regulations, 18 N.Y.C.R.R. §§ 400–484.

The Complaint in *Marisol* alleges a wide range of abuses suffered by the eleven children who sought to represent the plaintiff class. The factual allegations of the Complaint also identify systemic problems of the child welfare system in the City of New York. In an Opinion dated June 18, 1996, this Court granted class certification under Rule 23(b)(2), defining the plaintiff class as:

> [a]ll children who are or will be in the custody of the New York City Administration for Children's Services ("ACS"), and those children who, while not in the custody of ACS, are or will be at risk of neglect or abuse and whose status is known or should be known to ACS.

929 F.Supp. 662, 693–94.

The Court granted City and State defendants' application, pursuant to 28 U.S.C. § 1292(b), for an interlocutory appeal from the Court's Opinion certifying the *Marisol* plaintiff class dated March 1, 1996. *See* Memorandum and Order of Hon. Robert J. Ward dated July 26, 1996 (granting City defendants' application for interlocutory appeal); Stipulation and Order of Hon. Robert J. Ward dated August 7, 1996 (ruling that State defendants are deemed to have joined City defendants' application for interlocutory appeal); Memorandum and Order of Hon. Robert J. Ward dated August 12, 1996 (granting City and State defendants' application for interlocutory appeal as petitioners allowed original appeal period of ten days to lapse) *Marisol A. v. Giuliani*, 104 F.3d 524 (2d Cir.1996) (holding that District Court had the power to recertify order to enable appellant to file timely petition for leave to appeal), *cert. denied* 520 U.S. 1211, 117 S.Ct. 1694, 137 L.Ed.2d 821 (1997). On September 26, 1997, the Court of Appeals for the Second Circuit affirmed this Court's certification of

---

**2.** The Court has issued additional decisions concerning *Wilder v. Bernstein*. In 1994, the Court interpreted the Stipulation of Settlement to apply to kinship foster children. *Wilder v. Bernstein,* 153 F.R.D. 524 (S.D.N.Y.1994), *appeal dismissed* 49 F.3d 69 (2d Cir.1995). In 1998, the Court

issued a Memorandum Decision holding that the Stipulation of Settlement had not terminated. Memorandum Decision of Hon. Robert J. Ward dated July 1, 1998. An appeal of that decision is pending.

the plaintiff class. *Marisol A. v. Giuliani,* 126 F.3d 372 (2d Cir.1997).

In addition, the Second Circuit stated that "[w]ell in advance of trial, the district court must engage in a rigorous analysis of the plaintiffs' legal claims and factual circumstances in order to ensure that appropriate subclasses are identified, that each subclass is tied to one or more suitable representatives, and that each subclass satisfies Rule 23(b)(2)." *Id.* at 378–79. Following the direction of the Second Circuit, this Court certified the following subclasses:

Subclass One

Children whom the defendants know or should know have been abused or neglected/maltreated by virtue of a report of abuse or neglect/maltreatment.

Subclass Two

Children in families in which there is an open indicated report of abuse or neglect.

Subclass Three

Children in the custody of the Administration for Children's Services.

*Marisol A. v. Giuliani,* 1998 WL 199927, *10 (S.D.N.Y.1998) (Memorandum Decision and Order of Hon. Robert J. Ward dated April 23, 1998). The Court identified the deficiencies, legal claims, and named plaintiffs associated with each subclass. *Id.* Then, in May 1998, this Court granted intervention to three additional named plaintiffs and identified the subclasses they represented and the legal claims which they asserted. *Marisol A. v. Giuliani,* 1998 WL 265123 (Memorandum Decision of Hon. Robert J. Ward dated May 22, 1998). The Court also added and substituted next friends for certain of the named plaintiffs. *Id.*

## II. *MARISOL* SETTLEMENT AGREEMENTS

After more than two years of intensive discovery and on the eve of the July 27, 1998 trial date set by this Court in its Fourth Amended Scheduling Order dated June 1, 1998, the parties informed the Court that they were engaged in settlement negotiations. The trial date was postponed and the parties conducted negotiations for over four months. On December 2, 1998 two settlement agreements were filed with the Court:

the City Settlement Agreement signed by plaintiffs and City defendants and the State Settlement Agreement signed by plaintiffs and State defendants.

### A. Summary of *Marisol* City Settlement Agreement

The City Settlement Agreement establishes an Advisory Panel of four experts in the child welfare field who have been selected and approved by plaintiffs and City defendants ("*Marisol* Advisory Panel" or "Advisory Panel"). The Advisory Panel is composed of the following nationally respected child welfare experts:

1. Douglas W. Nelson, President of the Annie E. Casey Foundation, a private philanthropic organization dedicated to helping build better futures for disadvantaged children within the United States. He has served as the Assistant Secretary of the Department of Health and Human Services in Wisconsin and as head of its Division of Community Services.

2. John B. Mattingly, Senior Program Associate at the Annie E. Casey Foundation and its team leader for child welfare policy. He served for six years as head of the public child welfare agency of Toledo, Ohio.

3. Judith Goodhand, a consultant at the University of North Carolina Graduate School of Social Work. From 1992–98, she served as Executive Director of the Cayuhoga County Department of Children and Family Services in Cleveland, Ohio.

4. Paul Vincent, director of the Child Welfare Policy and Practice Group, a non-profit organization in Montgomery, Alabama that seeks to improve child welfare practices and currently assisting child welfare systems in ten states. From 1988–95, he was Director of Alabama's Division of Family and Children's Services, where he was responsible for implementing child welfare reforms as a result of a class action lawsuit. The improved performance of Alabama's child welfare sys-

tem earned him the 1994 Award for Excellence in Child Welfare Administration from the National Association of Public Child Welfare Administrators.

ACS has agreed to cooperate fully with the *Marisol* Advisory Panel and to provide the Advisory Panel with full access to information, documents, and personnel as it requests. The Advisory Panel will study the following areas of ACS's operations:

1. Maintaining or achieving permanency for children as discussed in the "Advisory Report on Permanency Issues in the New York City Child Welfare System" which was submitted to plaintiffs and the City on September 4, 1998;

2. Placement and evaluation issues arising out of the legal obligations in *Wilder* ("*Wilder* Obligations");

3. Monitoring and improving the performance of the private agencies that contract with the City to provide child welfare services;

4. The capacity to track front-line practice at ACS as it relates to subject matters 1, 2, and 3, above, so that ACS may better monitor, evaluate, and where necessary, improve the quality of such practice;

5. The system for evaluating and improving the quality, qualifications, and performance at the supervisory level of ACS as it relates to subject matters 1, 2, 3, and 4, above;

The *Marisol* Advisory Panel, at its discretion, may incorporate into its review of subject matters 1, 2, and 3, above, recommendations regarding other issues that directly affect these areas and may provide informal advice in all other areas. Additionally, the Advisory Panel must review the steps taken by ACS to fulfill the purpose of the Interim Stipulation and Order Concerning Overnights at Pre–Placement which was "so ordered" by this Court on July 17, 1997 and provide advice to ACS in this area.

The Advisory Panel is required to produce an Initial Report in each of the enumerated areas. Following these reports, the Advisory Panel must produce Periodic Reports to determine whether or not ACS is acting in good faith in making efforts toward reform in these areas.

Upon a finding by the *Marisol* Advisory Panel that ACS is not acting in good faith, plaintiffs may seek judicial relief. Plaintiffs would then be entitled to seek an adjudication that the City has violated the legal rights of the plaintiff class in the area reviewed, under applicable laws identified in the pleadings. In such a proceeding, the findings of the *Marisol* Advisory Panel are to be considered *prima facie* evidence that ACS is not acting in good faith. The parties have stipulated to the admissibility of the Advisory Panel's Initial and Periodic Reports and the testimony of the Advisory Panel members.

The City Settlement Agreement also calls for the dismissal of *Wilder* and all of its obligations at the time of final approval of the *Marisol* City Settlement Agreement.[3]

The City Settlement Agreement which expires and terminates on December 15, 2000, contains limitations on the filing of lawsuits through covenants not to sue and release provisions. There are three provisions, falling under the heading of "Covenants Not to Sue," in the City Settlement Agreement. First, plaintiffs agree not to sue or assign any cause of action in any court for specific performance or enforcement of the City Settlement Agreement during or after the expiration of its terms except as provided for in the Agreement. Second, plaintiffs agree not to sue or bring or assign any cause of action for systemic declaratory, injunctive, or other form of equitable relief against the City based on events occurring prior to the signing of the City Settlement Agreement and

---

**3.** In addition to seeking the dismissal of *Wilder* upon the approval of *Marisol,* the City Settlement Agreement calls for the suspension of *Wilder* activities prior to the approval of the Settlement Agreement. Upon the signing of the City Settlement Agreement by the parties, plaintiffs and the City agreed to the immediate suspension of most of the *Wilder*-related activities. The parties also agreed to seek and did seek, by an order to show cause with a proposed temporary restraining order, the Court's approval for the suspension of court conferences and all activities of the *Wilder* settlement panel, including any audits or case reviews.

based on, arising out of, or relating to claims that were or could have been asserted in the pleadings, except as provided for in the Agreement. Third, plaintiffs agree not to commence any new actions for systemic declaratory, injunctive, or other form of equitable relief based on facts or events which relate to *Marisol* as described in Plaintiffs' Statement of Claims to be Tried, set forth in the Pre–Trial Order dated July 16, 1998, and which occur after the signing of the agreement and prior to December 15, 2000. Plaintiffs also agree to defer, until December 16, 2000, any new action for systemic declaratory, injunctive, or other form of equitable relief based on claims raised in the pleadings but which were not raised in Plaintiffs' Statement of Claims to be Tried and which occur after the signing of this Agreement and prior to December 15, 2000.

Through the release provisions of the City Settlement Agreement, plaintiffs, individually and on behalf of all class members and their successors, release the City, from the beginning of time through the Court's approval of the Agreement, from equitable claims and actions arising from or in any way relating to any equitable claim which is or could have been stated in the pleadings, other than a claim by an individual plaintiff for equitable relief tailored to the specific circumstances of the individual. Additionally, upon the expiration of the Agreement on December 15, 2000, plaintiffs release the City from any equitable claims or actions which took place from the date of the Court's approval of the Agreement to December 15, 2000, arising out of or relating to any equitable claim which is or could have been stated against the City in Plaintiffs' Statement of Claims to be Tried, set forth in the Pre–Trial Order dated July 16, 1998, other than claims by an individual for equitable relief tailored solely to the specific circumstances of the individual.

These covenants not to sue and releases, however, do not prevent an action at any time by an individual seeking damages or equitable relief tailored to the specific circumstances of the individual's claims. Further, after December 15, 2000, plaintiffs can bring an action seeking systemic declaratory, injunctive, or other forms of equitable relief

based on claims arising after December 15, 2000 and can offer into evidence facts, events, actions, or omissions which may have occurred prior to December 15, 2000.

### B. Summary of *Marisol* State Settlement Agreement

Under the State Settlement Agreement, the New York State Office of Children and Family Services ("OCFS") must establish a Regional Office in New York City to monitor and supervise child welfare services only within New York City ("New York City Regional Office" or "NYCRO"). The Agreement also describes the functions of the Director of the New York City Regional Office and the NYCRC's staffing requirements.

The State Settlement Agreement requires that OCFS prepare the annual fatality reports for 1997 and 1998 by June 1999 and prepare all subsequent fatality reports in a timely manner. Further, these reports must be discussed with ACS as well as any need for corrective action. NYCRO must also complete individual fatality reports according to a schedule designed by the parties and direct ACS to adopt corrective action when it deems necessary.

The State Central Register ("SCR"), which is the child abuse/neglect hotline, must, among other things: (1) review and evaluate its policies regarding educational neglect; (2) clarify to SCR personnel its domestic violence policies; (3) continue to spot check telephone calls to assure that calls are not screened out inappropriately; (4) continue to make reasonable efforts toward the goal of answering all calls within one minute; and (5) develop and implement an advertising campaign about the hotline.

OCFS, prior to the termination of the State Settlement Agreement, is required to undertake one or more case record reviews of ACS records in the following areas to determine if ACS is complying with applicable laws and reasonable case work practice:

1. child protective services cases;
2. open indicated cases;
3. cases receiving protective supervision in the home;

4. cases receiving mandated preventive services;

5. cases of children in placement with a goal to return home;

6. cases of children in placement with a goal of adoption;

7. cases of children in placement with a goal of independent living;

8. cases of children in placement for more than four years; and

9. frequency of visitations to the home and child during investigations and while in custody.

If, after completing its case record review(s), OCFS determines that ACS is in substantial non-compliance with applicable laws, regulations and/or reasonable case work practice, OCFS must direct ACS to take corrective action designed to improve ACS's performance in the specific areas of non-compliance. Further, the NYCRO must use reasonable efforts to provide technical assistance and exercise its monitoring authority in an appropriate manner.

OCFS must also use reasonable efforts to develop implement a state-wide computer system to collect child welfare information. Upon review of ACS's training curriculum for Child Protective Services caseworkers and supervisors, OCFS must make recommendations regarding the curriculum, if warranted. NYCRO must continue to audit licensed congregate foster case facilities. The agreement also designates meeting dates for plaintiffs, OCFS, and NYCRO. Further, if plaintiffs determine that the State defendants are in violation of the State Settlement Agreement, prior to taking any action, plaintiffs must provide reasonable notice to counsel for OCFS of the areas of non-compliance, OCFS will respond, and then the parties will meet and make a good faith effort to resolve any differences without seeking judicial relief. If the parties cannot reach agreement, before requesting further judicial remedies to enforce the terms and conditions of the Settlement Agreement in dispute, plaintiffs will seek an order directing compliance with the State Settlement Agreement.

The duration of the State Settlement Agreement varies, with some provisions expiring twenty-one months and some expiring twenty-four months after the entry of an Order of Dismissal by this Court. The State Settlement Agreement also contains a covenant not to sue. Throughout the duration of this Agreement, plaintiffs cannot bring a class action suit against the State for injunctive or declaratory relief based on any cause of action set forth in the Pre–Trial Order dated July 16, 1998 and cannot bring individual suits alleging system-wide violations arising out of claims based upon new facts or circumstances that occur during the duration of the Settlement Agreement. Further, class-wide or systemic claims arising from new facts or circumstances that occur during the State Settlement Agreement and which relate in any way to any claim raised in the Pre–Trial Order are resolved by the State Settlement Agreement. However, the Agreement does not preclude an individual class member from filing an action on his or her own behalf against State defendants seeking damages and equitable relief to protect the individual's rights.

## C. Court Orders and Proceedings Surrounding the Settlement Agreements

During December 1998 and January 1999 the Court signed several orders concerning the *Wilder* and *Marisol* cases. On December 4, 1998, this Court issued an Order providing for the dissemination of notice regarding the settlement of *Marisol* and dismissal of *Wilder* to the *Marisol* and *Wilder* class members. Notice was posted in both English and Spanish in locations most likely to be seen by children. All of the notices were mailed within ten business days of the signing of the Order, thereby reaching facilities more than a month in advance of the fairness hearing. Notice was posted in many locations, including facilities that house foster children, agencies that contract with ACS to provide foster care and/or preventive child welfare services, hospitals, family courts where legal representatives of the children frequent, and a host of facilities where children in the *Marisol* class are routinely present. The notice summarized the *Marisol* and *Wilder* cases and the Settlement Agreements, described how to receive additional

information about the cases, and explained how to submit comments and/or objections to the Court and request the opportunity to speak at the hearing regarding the Settlement Agreements. Additionally, in the Order, the Court preliminarily approved the Settlement Agreements, in accordance with the Settlement Agreements and pursuant to Federal Rule of Civil Procedure 23(e).

The Court suspended its July 17, 1997 Order Concerning Overnights at Pre–Placement pending the approval of the Settlement Agreements. Order Suspending the Interim Stipulation and Order Concerning Overnights at Pre–Placement by the Hon. Robert J. Ward dated December 17, 1998. On December 21, 1998 the Court signed an Order Suspending Certain *Wilder* Activities which stayed most of the *Wilder* Settlement Panel's duties pending approval of the *Marisol* Agreement and the dismissal of *Wilder*.

In addition to its own review of the Settlement Agreements prior to issuing its Order dated December 4, 1998, the Court scheduled a fairness hearing for January 22, 1999 to hear the concerns of all persons interested in the Settlement Agreements. The notice to the plaintiff classes of *Marisol* and *Wilder*, which was distributed in early December 1998, stated that comments and objections were to be received by the Court no later than 12:00 p.m. on January 15, 1999. The Court received eight comments. Then, on January 22, 1999 the Court held the hearing to determine if the *Marisol* Settlement Agreements were fair, reasonable, and adequate and whether a motion which was filed on December 30, 1998 to formally dismiss the *Wilder* case should be granted.

At the hearing on January 22, 1999, first, the parties and some persons identified by the parties as proponents of the Agreements spoke in favor of the Settlement Agreements. The Court then gave all those who had submitted comments or objections regarding the Settlement Agreements the opportunity to speak.[4] Five of the eight persons or organizations that commented on the Settlement Agreements were present or represented on January 22, 1999 and heard by the Court. Douglas Nelson, one of the experts chosen to be a member of the *Marisol* Advisory Panel, then spoke on behalf of the panel in favor of the *Marisol* City Settlement Agreement. The Court permitted the parties to respond to the comments and allowed an objector who requested to be heard again, that opportunity.

During the hearing the Court responded orally to some of the comments of those who spoke. Specifically, the Court granted The Legal Aid Society amicus status in *Marisol* and requested that the parties in *Marisol* continue to keep the Archdiocesan child care agencies affiliated with the Roman Catholic Archdiocese of New York abreast of the reports filed by the *Marisol* Advisory Panel as these agencies had long been recognized as interested parties in *Wilder*.[5] The Court also granted plaintiffs in *Joel A. v. Giuliani*, 99 Civ. 326, a newly filed action, the right to intervene in the *Marisol* litigation to interpose objections.[6]

At the close of the hearing, after considering all of the written and oral submissions and evaluating the Settlement Agreements, the Court stated that it approved the Settlement Agreements as fair, reasonable, and adequate. The Court also stated that a written opinion would follow.[7]

## DISCUSSION

 Federal Rule of Civil Procedure 23(e) requires that "[a] class action shall not be

---

4. Additionally, the Court allowed persons who did not comply with the objection deadline to speak. Therefore, the Court heard from all persons with comments and/or objections who wished to be heard.

5. On January 22, 1999, the Court also signed a Memorandum Decision permitting the intervention in *Marisol* of nineteen child care agencies with regard to the *Wilder* Obligations. The Court, however, later vacated this Memorandum Decision as the parties and these intervenors entered into a Stipulation that essentially addressed the motion to intervene that was filed and the remainder of the motion was withdrawn. *See* Stipulation and Order dated February 5, 1999.

6. The circumstances surrounding the Joel A. plaintiffs are discussed more fully, *infra* Discussion Section IV.A.

7. The parties were directed to settle final judgments on two days notice.

dismissed or compromised without the approval of the court...."[8] To protect the interests of the class, the Court must closely examine the proposed settlement to determine if it is "fair, adequate and reasonable...." *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1323 (2d Cir. 1990) (quoting *Plummer v. Chemical Bank*, 668 F.2d 654, 658 (2d Cir.1982)).

 The Court determines if a settlement is fair, reasonable, and adequate by considering: "(1) the substantive terms of the settlement compared to the likely result of a trial, and (2) the negotiating process, examined in light of the experience of counsel, the vigor with which the case was [litigated], and the coercion or collusion that may have marred the negotiations themselves." *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir.1983) (internal citations omitted). In conducting this analysis, there are nine factors, the *Grinnell* factors, commonly considered:

(1) the complexity, expense and likely duration of the litigation,

(2) the reaction of the class to the settlement,

(3) the stage of the proceedings and the amount of discovery completed,

(4) the risks of establishing liability,

(5) the risks of establishing damages,

(6) the risks of maintaining the class action through the trial,

(7) the ability of the defendants to withstand a greater judgment,

(8) the range of reasonableness of the settlement fund in light of the best possible recovery,

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation[.]

*County of Suffolk v. Long Island Lighting Co.*, 907 F.2d at 1323–24 (quoting *Robertson v. National Basketball Ass'n*, 556 F.2d 682,

684 n. 1 (2d Cir.1977) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974))). The Court will not examine the last three criteria as they are applicable only in actions for damages, and will examine the fifth criteria in light of establishing remedies instead of damages.

## I. THE *GRINNELL* FACTORS ARE MET BY THE CITY AND STATE SETTLEMENT AGREEMENTS

 The Court finds that the *Marisol* City and State Settlement Agreements provide substantial relief to the plaintiff class. After reviewing the Agreements, which are summarized above, *supra* Background Section II., and considering the *Grinnell* factors established by the Second Circuit for the examination of class action settlements, the Court has determined that these Settlement Agreements are fair, reasonable, and adequate.

### A. The Complexity, Expense and Likely Duration of the Litigation

As is clear from the procedural history of this case and the many filings by the parties, this is a complex case presenting many difficult and unsettled legal questions. The Complaint asserted numerous federal and state constitutional and statutory violations. These alleged violations do not raise concerns in just one or two areas of ACS's operations but raise concerns across the spectrum of child welfare issues, from training of the staff to housing of the children to the adequacy of services provided by ACS and its contract agencies. This Court, with over twenty years of involvement with child welfare issues, would not hesitate to say that *Marisol* and *Wilder* present some of the most complex issues in the child welfare arena.

All parties involved have already incurred substantial expenses. There has been extensive motion practice in this case, including a motion to dismiss, a motion for class certification, a motion to vacate, a motion to intervene, discovery motions, privilege motions,

---

8. Federal Rule of Civil Procedure 23(e) also states that "notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." The Court finds that the notice, discussed *supra* Background Section II.C., was adequate and widely disseminated and that the notice was posted in ample time for interested persons to comment and attend the fairness hearing.

motions concerning experts, and *in limine* motions on evidentiary issues. The Court also conducted a contempt hearing regarding the Pre–Placement Center operated by ACS.

The trial would be extremely costly. A trial of at least five months duration was anticipated. Plaintiffs expected 133 witnesses and an additional twelve experts to testify either in person or by deposition. *See* Revised Identification of Witnesses to be Called on Plaintiffs' Case–in–Chief Against the City and State Defendants, dated July 22, 1998. City defendants listed hundreds of persons and thirteen experts as potential witnesses. *See* City Defendants' Revised Witness List. State defendants planned to call 49 witnesses. *See* Joint Pre–Trial Order dated July 16, 1998.

Further, the additional expenses associated with litigation would not have ended with the trial. All parties submitted proposed findings of fact to the Court, with plaintiffs submitting over 2,700 pages of proposed findings of fact against the City and State. With so much paperwork and such a long trial, extensive post-trial briefing would also have been necessary. If plaintiffs were ultimately successful, additional time and money would need to be expended for the Court to fashion a remedy. In the event this case had gone to trial, it would have been the longest non-jury case this Court had tried in its 26 years of experience. The expense, complexity, and duration that would have been involved in this case if it were to go to trial weighs in favor of the approval of these Settlement Agreements.

### B. The Reaction of the Class to the Settlement

The second factor looked at when examining a class action settlement agreement is the reaction of the class. As described above, *supra* Background Section II.C., adequate notice of the proposed settlement of *Marisol* and dismissal of *Wilder* was provided to the class members. The notice was widely disseminated with clear instructions as to how to submit comments to the Court and with an adequate period of time for such comments to be submitted.

Eight comments regarding the Settlement Agreements were received with only three of them raising direct objections to the Agreements. The Court views the small number of comments from a plaintiff class of over 100,000 children as evidence of the Settlement Agreements' fairness, reasonableness, and adequacy. *See Ross v. A.H. Robins Co., Inc.,* 700 F.Supp. 682, 684 (S.D.N.Y.1988) (citations omitted) ("the absence of objectants may itself be taken as evidencing the fairness of the settlement"). The Court discusses each of the comments and objections submitted *infra* Discussion Section IV.

### C. The Stage of the Proceedings and the Amount of Discovery Completed

The third factor to consider is the stage of the proceedings and the amount of discovery completed. The Court is satisfied that the parties entered into settlement discussions with ample information as to what a trial would entail. As noted above, the parties were on the eve of trial when they informed the Court that they were involved in serious settlement negotiations. Extensive discovery had been conducted, including over 200 deposition days, over 100,000 pages of documents provided by the City and State, and the exchange of extensive expert reports. Pretrial briefing had been completed and the joint pretrial order, witness lists, and exhibit lists had been filed. All parties had submitted proposed findings of fact to the Court. The action clearly had proceeded sufficiently for counsel to obtain a thorough understanding of the complexity of the issues and the strengths and weaknesses of their claims and defenses. Accordingly, the third of the *Grinnell* factors weighs in favor of approving the Settlement Agreements.

### D. The Risks of Establishing Liability

The fourth factor the Court must consider when reviewing these class Settlement Agreements is the risks of establishing liability. By the time the parties entered into serious negotiations, they had had ample time to analyze the facts and the law to determine the risks they faced. This Court has been involved with the *Marisol* case since its inception in December 1995 and is

therefore fully aware of the complexity of the legal issues. With over 2,700 pages of Proposed Findings of Fact submitted by plaintiffs and numerous violations of both federal and state constitutional and statutory laws alleged, this Court cannot even begin to accurately assess the possible outcome of this case. The Court is confident that plaintiffs would present a compelling case, but the Court is likewise confident that the State and City defendants would present factual and legal arguments in this non-jury case sufficient to cause serious deliberation by the Court.

This Court, however, does "not [need to] decide the merits of the case or resolve unsettled legal questions." *Carson v. American Brands, Inc.,* 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981). Instead, this Court needs to weigh the likelihood of success by the plaintiff class against the relief offered by the Settlement Agreements. *Id.* The Court finds that even assuming that plaintiffs had a strong chance of success at trial with respect to liability, the relief granted by the Settlement Agreements is sufficiently favorable to weigh in favor of approval of the Settlement Agreements. The Court discusses the relief more fully *infra* Discussion Section I.E.

### E. The Risks of Establishing Damages [Remedies]

While the *Marisol* case sought declaratory and equitable relief, rather than damages, the Court still considers the risks of establishing the sought-after "remedy" in examining whether the Settlement Agreements are fair, reasonable, and adequate. *See Wilder v. Bernstein,* 645 F.Supp. 1292, 1340 (S.D.N.Y.1986). Even if plaintiffs were to establish liability, it is not clear, nor has any person objecting to the Settlement Agreements suggested, that an alternative remedy would be more appropriate.

The City of New York has been working to reform the child welfare system. For example, since January 1996 the average caseload for child protective workers has decreased significantly, adoptions have increased, and ACS has hired over 1,250 new caseworkers. Therefore, while plaintiffs may have been able to establish liability, the Court may not have been in a position to provide for more relief than simply encouraging continued effort and improvement by ACS.

In addition to declaratory and injunctive relief, plaintiffs sought the remedy of appointing a receiver. The Court, however, does not find it likely that plaintiffs would have been granted such relief. It is more likely that the Court would have determined that no receiver would do a better job than that done by the current Commissioner of ACS, Nicholas Scoppetta. In this regard, the Court finds the Settlement Agreements more favorable to the plaintiff class than any relief that the Court would have unilaterally ordered. Under the City and State Agreements, an Advisory Panel with access to all of the records of ACS has been created, and a State office been established with the sole purpose of monitoring the child welfare system in New York City.

This Court finds that the City and State Settlement Agreements touch on almost all, if not all, of the City and State functions involving the New York City child welfare system. As the Agreements are summarized above, *supra* Background section II., the Court will not go into an extensive discussion of them here. However, it is important to note that the City Settlement Agreement provides the Advisory Panel with unfettered access to ACS personnel and records. The Advisory Panel is required to report on a broad range of ACS's operations, including any subjects that are related to the enumerated areas specified in the City Settlement Agreement, and is encouraged to comment on any additional subject areas it finds relevant. Among other things, the State Agreement provides for a larger staff at the New York City Regional Office and the change from a multi-county office to a strictly New York City Office.

Further, the City Settlement Agreement provides for a streamlined procedure for the plaintiff class to return to this Court if the Advisory Panel finds the City is not acting in good faith in any of the areas designated by the City Settlement Agreement for review by the Advisory Panel or in related areas. Plaintiffs can make out a *prima facie* case of

the City's violation of the Settlement Agreement merely by introducing the Advisory Panel's finding(s) of bad faith. If liability is established, the plaintiffs can then seek more extensive relief. Additionally, plaintiffs can return to Court to seek State compliance with the terms of the State Settlement Agreement if the State fails to comply.

With the beneficial terms of the Agreements and safeguards in place should the City or State fail to comply, the Court believes that these voluntary Settlement Agreements are more favorable than any remedy that could have been imposed by the Court at the end of a trial. Therefore, this factor weighs heavily in favor of the Court finding the Settlement Agreements to be fair, reasonable, and adequate.

### F. The Risks of Maintaining the Class Action Through the Trial

This Court approved the class certification, *Marisol A. v. Giuliani*, 929 F.Supp. 662 (S.D.N.Y.1996), and the Second Circuit affirmed the certification, *Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir.1997). Subsequently, this Court certified subclasses. *Marisol A. v. Giuliani*, 1998 WL 265123 (S.D.N.Y. May 27, 1998). Therefore, it is unlikely that the class would have been decertified during or after trial.

### G. All of These Factors Show that the Agreement is Fair, Reasonable, and Adequate[9]

Examining all of the *Grinnell* factors, this Court finds that the Settlement Agreements in this complex litigation are fair, reasonable, and adequate.

### II. THE SETTLEMENT AGREEMENTS WERE NEGOTIATED BY EXPERIENCED COUNSEL AT ARMS–LENGTH

■ An additional factor to be considered by courts in evaluating class action settlements is the vigor and independence of counsel in negotiating the terms of the agreements. *See Malchman v. Davis*, 706 F.2d at 433. Some of the attorneys in *Marisol* have appeared before this Court for more than twenty years in conjunction with child welfare cases.[10] Through discovery, motion practice, and conferences, in the *Marisol* case, this Court has consistently been in contact with counsel and observed counsels' interactions. The Court is confident in stating that these agreements were reached after extensive, arms-length negotiations between experienced counsel for the respective signatories.

As noted, counsel engaged in more than two years of vigorous litigation. During this time, extensive discovery an motion practice was conducted. After being well-positioned, base on the extensive discovery conducted, the parties maintained two separate negotiations, one between plaintiffs and the City and on between plaintiffs and the State, over a period of more than four months.

Because of the high level of experience that counsel for all parties have in child welfare issues and litigation seeking institutional reform, the Court views the Settlement Agreements favorably. For example, plaintiffs' counsel in *Marisol* also litigated the *Wilder* case. Thus, before reaching agreement in *Marisol*, these attorneys negotiated a Stipulation of Settlement in *Wilder* and had observed the successes and failures of the agreement in that case. They had first-hand knowledge of what approaches do and do not improve the New York City child welfare system.

Therefore, the Court views these arms-length negotiations among experienced counsel as weighing in favor of the approval of the *Marisol* Settlement Agreements.

### III. DISMISSAL OF *WILDER* IS FAIR, REASONABLE, AND ADEQUATE

■ The Court finds that the dismissal of *Wilder*, is fair, reasonable, and adequate.

---

9. The Court will not examine the last three *Grinnell* factors as they relate to monetary damages and no such damages were sought in this case.

10. Children's Rights, Inc., counsel for plaintiffs, represents plaintiffs in the *Wilder* case. After many interactions with attorneys from Children's Rights, Inc., the Court finds this organization to be dedicated to and highly experienced in children's issues.

The City Settlement Agreement addresses and advances the needs of the *Wilder* plaintiff class, rendering the continuation of *Wilder* unnecessary. Accordingly, the Court grants the motion to dismiss *Wilder*.

Recognizing the significance of the principles of the *Wilder* case, the parties in *Marisol* have incorporated the primary concerns and goals of *Wilder* in the City Settlement Agreement. The parties included an entire section in the City Settlement Agreement to address the *Wilder* concerns. *See* City Settlement Agreement, Section F. "Special Provisions Applicable in the '*Wilder*' Subject Area." Plaintiffs and the City both acknowledged that the following principles were established in *Wilder*:

 i. All children, whether placed with relatives or non-relatives, shall be placed on a first-come first-served basis in the best available agency program that is appropriate for the child's needs, regardless of the child's race or religion. All children place in foster boarding homes shall be placed with foster boarding home families appropriate for their needs; and

 ii. ACS and the contract agencies shall follow practices and policies that ensure that children in placement have the right to be free from the imposition of religious practices and have the right to practice their own religion while in placement; and

 iii. The City will continue its efforts to improve the quality of care available to all children in placement . . .

*Id.* Section F. ¶ 30.a.

Further, one of the five specifically enumerated areas to be studied by the *Marisol* Advisory Panel incorporates the principles of *Wilder*. The Advisory Panel must review the "[p]lacement and evaluation issues arising out of an agreed-upon set of existing legal obligations in *Wilder* set forth in paragraph 30.b, below ('*Wilder* Obligations')." *Id.* Section C. ¶ 11.b. In the Initial Report concerning the *Wilder* Obligations, the Advisory Panel is to determine,

 whether to retain, modify, substitute for or eliminate any of the following obligations:

 i. implement a classification system, to be developed by an outside consultant, that

measures and classifies all placement agency programs by 'meaningful differences in quality' within the various program categories;

 ii. maintain accurate vacancy lists and establish waiting lists for certain programs, when appropriate;

 iii. determine children's service needs, level of care, and program type by an evaluation performed by qualified personnel in accordance with good social work practice, so that an appropriate placement can be chosen for them; such evaluation shall be done prior to placement or not later than thirty (30) days after referral to ACS for placement or in the case of placement prior to evaluations, not longer than thirty (30) days after actually being placed;

 iv. determine appropriateness of placements in certain cases by conducting a *de novo* review of the child's placement and of the child's needs within ten (10) days after the child's evaluation is completed;

 v. employ two hundred (200) Child Evaluation Specialists (a title requiring the employees to hold at least an MSW degree) to conduct the evaluations and review the appropriateness of each child's placement;

 vi. ensure that foster care agencies accept all children referred to them, except where the agency lodges a 'therapeutic objection' subject to ACS's overruling, which the agency may challenge before an impartial arbiter; and

 vii. ensure that foster care agencies conduct the required screening of kinship foster homes and training of kinship foster parents and provide required services to children in kinship foster care.

*Id.* Section F. ¶ 30.b.

Then, in subsequent Periodic Reports, the Advisory Panel will comment on ACS's activities in response to the Initial Report. Because these rights were already established in *Wilder*, a separate enforcement mechanism has been created in *Marisol*, so that the *Wilder* obligations will be directly enforceable if the Advisory Panel finds an absence of good faith compliance by the City defendants.

The incorporation of the *Wilder* Obligations into *Marisol* allows for the review of the *Wilder* concerns without having the existence of two parallel panels. As the *Marisol* Settlement Agreements provide for an expansive review of the operations of ACS, the continued existence of the *Wilder* Settlement Panel would cause ACS to be scrutinized by two panels, at the same time, with overlapping jurisdiction. Such a system would be impracticable and unmanageable, with the possibility of conflicting recommendations regarding similar subject matter.

This Court finds the comprehensive approach contained in the City Settlement Agreement, an approach agreed upon by both parties in the *Wilder* action, to better fulfill the goals of *Wilder*. The *Wilder* Obligations, which affect only one aspect of the child welfare system, have proven extremely difficult to implement within a system with so many other functioning areas. Thus, the parties, after discussing and litigating the *Wilder* issues for over two decades, have agreed to approach the *Wilder* concerns in conjunction with a wide range of reforms to benefit the children of New York City's child welfare system.

Additionally, the Court acknowledges that at no time was the *Wilder* Stipulation of Settlement intended to last indefinitely. To the contrary, the *Wilder* Stipulation of Settlement was time-limited, and after a life of over ten years, the parties, as well as the Court, recognized that the end was in sight for this document which was written during a very different time in the history of New York City's child welfare system. On December 30, 1997, the Court issued a Memorandum Decision denying the City's motion to declare the Stipulation of Settlement terminated. However, the Court was in the

process of setting a termination date for the *Wilder* Stipulation of Settlement when the parties informed the Court that the incorporation of *Wilder* into the *Marisol* City Settlement Agreement was being contemplated.

As stated above, this Court has been involved in the *Wilder* litigation since its inception over twenty years ago. Upon consideration of the issues involved in *Wilder*, this Court finds that the dismissal of *Wilder* is fair, reasonable, and adequate in view of the *Marisol* City Settlement Agreement's incorporation of the Wilder principles.[11]

## IV. THE OBJECTIONS AND COMMENTS TO THE SETTLEMENT AGREEMENTS DO NOT WARRANT DISAPPROVAL OF THE SETTLEMENT AGREEMENTS OR A REFUSAL TO DISMISS *WILDER*

As noted above, the Court received eight written comments and/or objections regarding the Settlement Agreements. All of those who submitted comments and/or objections were also given the opportunity to speak at the fairness hearing held on January 22, 1999.[12] None of objections warrant the disapproval of the Settlement Agreements or of the denial of the motion to dismiss *Wilder*.

### A. The Joel A. Plaintiffs

An action on behalf of lesbian, gay, bisexual, and transgendered youth in the New York City foster care system was filed against City and State officials on January 15, 1999. *Joel A. v. Giuliani*, 99 Civ. 0326(RJW). Also on January 15, 1999, the Joel A. plaintiffs filed a "Memorandum in Support of Motion to In-

---

11. There were two comments raised regarding the dismissal of *Wilder*. First, nineteen contract child care agencies who were intervenors in *Wilder* moved for intervention in *Marisol*. These contract agencies later withdrew their motion as they reached a stipulation with the *Marisol* parties with regard to their concerns. *See* Stipulation and Order dated February 5, 1999. Besides requesting intervention, these agencies, which had long been parties in *Wilder*, did not object to the approval of *Marisol* and the dismissal of *Wilder*. Second, OHEL, a private contract agency that was a defendant in *Wilder*, objected to the

dismissal of *Wilder* because a specific paragraph in the *Wilder* Stipulation of Settlement was not incorporated in the *Marisol* City Settlement Agreement. The Court further reviews this objection *infra* Discussion Section IV.C.

12. Additionally, the Court allowed Dr. DeLois Blakely, who did not submit a comment by the appointed date of January 15, 1999 and arrived at the courtroom as the fairness hearing was coming to an end, to be heard.

tervene and Objections to Proposed Class Action Settlement." [13]

In the course of the fairness hearing, the Joel A. plaintiffs withdrew their motion except for the limited purpose of interposing objections to the *Marisol* Settlement Agreements. The Court then endorsed the Memorandum filed by the Joel A. plaintiffs as follows: [14]

> The portion of the within motion seeking to intervene for the purpose of interposing objections to the proposed class action settlement is granted.
>
> The balance of the motion has been withdrawn in open court.
>
> It is so ordered.

Therefore, the Court will only address the objections raised by the Joel A. plaintiffs.

### 1. The Term "Permanency" in the City Settlement Agreement is Not Vague or Incomplete

■ The Joel A. plaintiffs object to the City Settlement Agreement, arguing that a key term of the Agreement is vague and incomplete and has been withheld from the plaintiff class. In the City Settlement Agreement, five specific areas of ACS's operations are listed as areas to be reviewed by the Advisory Panel. After reviewing these areas, the Advisory Panel is to produce Initial Reports, available to the public after counsel for the parties review and comment on them, as well as Periodic Reports regarding ACS's performance in these areas. One such area to be reviewed by the Advisory Panel is described in the City Settlement Agreement as "[t]he areas and issues discussed in the 'Advisory Report on Permanency Issues in the New York City Child Welfare System,' submitted to the Plaintiffs and the City on September 4, 1998 (the 'Permanency' subject matter area)." The Joel A. plaintiffs object to the 26-page City Settle-

ment Agreement as being vague and incomplete because the "Advisory Report on Permanency Issues in the New York City Child Welfare System" is not yet available to the public,[15] and as such they find the term "permanency" to be too vague to permit approval of the City Settlement Agreement.

The Court finds no merit to this objection. First, the parties had the Advisory Panel issue this report during settlement negotiations so that the parties could evaluate the Panel's approach to one of the problems it would be called upon to address. Second, it is clear to the Court that permanency issues encompass the permanent placement of children within the care of ACS. Finally, one of the benefits of the Advisory Panel is that highly experienced persons in the child welfare arena are given a basic mandate to review areas of ACS's operation and are also given some discretion in the scope of the review. The Joel A. plaintiffs seem to be arguing against this very basic tenet of the City Settlement Agreement which the Court finds to be an attribute favorable to the plaintiff class.

### 2. The Settlement Agreements Do Not Provide *Marisol* Subclass III with Illusory Relief in Exchange for Unfair and Oppressive Terms

■ The Joel A. plaintiffs argue that the Settlement Agreements provide *Marisol* Subclass III, of which they are members, with illusory relief in exchange for unfair and oppressive terms, impairing the class members' rights to due process of law. The Court finds nothing about the terms of the Settlement Agreements to be illusory nor does it find the terms of the Settlement Agreements to be unfair or oppressive to the plaintiff class.

The Court turns first to the argument that "[n]ot one provision in the City or State

---

**13.** The Joel A. plaintiffs did not, however, file or serve a notice of motion as required by Federal Rule of Civil Procedure 24(c) or Local Civil Rule 6.1.(a). Despite the fact that the motion was procedurally barred, the Court permitted the Joel A. plaintiffs to be heard.

**14.** The Court endorsed the Memorandum as no motion was filed.

**15.** At the time of the fairness hearing, the "Advisory Report on Permanency Issues in the New York City Child Welfare System" was still in draft form and therefore not available to the public.

Settlement Agreements provides tangible relief to the members of Marisol Subclass III. . . ." Joel A. Plaintiffs' Memorandum in Support of Motion to Intervene and Objections to Proposed Class Action Settlement at 21. After reviewing the Settlement Agreements and drawing from its years of experience in the child welfare arena, the Court finds this statement to evidence a lack of understanding of the settlement.

Subclass III is comprised of "[c]hildren in the custody of the Administration for Children's Services." In almost all respects, the City and State Settlement Agreements are designed to benefit these children. As expanded upon above, the City Settlement Agreement provides for a panel of nationally respected and renowned child welfare experts to comprehensively evaluate the operations of ACS. Without restating all of the areas that the Advisory Panel is to review, the City Settlement Agreement clearly includes the placement and evaluation of children within the care of ACS, the monitoring and improving of the performance of private agencies that contract with the City to provide child welfare services for children in the care of ACS, and the evaluation of front-line practices that affect all of these areas involving children within the care of ACS. In order to evaluate these areas and provide Initial and Periodic Reports, the Advisory Panel has been given full access to information, documents, and personnel of ACS. The Court finds none of this relief to be illusory.

The Joel A. plaintiffs point to the fact that the Advisory Panel has no definitive dates by which it must submit these reports as evidence that the City Settlement Agreement provides no relief for *Marisol* Subclass III plaintiffs. The Advisory Panel has a time frame during which to complete its tasks and within that time period it must provide these reports. Given the expertise of the Advisory Panel, the Court is not concerned that specific dates for the Reports are not included in the Settlement Agreement., If anything, this provides the Advisory Panel with more flexibility in fashioning comprehensive reports.

The Joel A. plaintiffs do not indicate how the State Settlement Agreement is illusory. Accordingly, the Court finds the claim unsupported. As stated above, the State Settlement Agreement provides for specific actions to be taken by the State, including establishing NYCRO and monitoring functions which benefit children in the care and custody of ACS.

In addition, the Joel A. plaintiffs argue that the Settlement Agreements contain "unfair and oppressive terms," referring to the covenants not to sue and releases in the Settlement Agreements. *See supra* Background Section II. (summarizing the Settlement Agreements). The Court has given considerable thought to these provisions and does not find them to be unfair or oppressive. All class members can bring individual suits at any time based on any claim seeking damages or injunctive relief, as long as the injunctive relief sought is not system-wide and is tailored to the individual's concerns. Therefore, any individual claims raised by the Joel A. plaintiffs or other class members can be immediately addressed in a lawsuit. Moreover, in exchange for the covenants not to sue and releases, the City is making available to the panel all of its records and personnel, an unprecedented occurrence. While this open door policy is in effect, the Court finds that it is reasonable for the City to require some protection against class action suits.

Further, the Court finds the only case law cited to support the claim that the covenants not to sue and releases are oppressive to be easily distinguishable from this case. In *J.A. Shults v. Champion Int'l Corp.*, 821 F.Supp. 520 (E.D.Tenn.1993), the court rejected a settlement agreement between a plaintiff class of riparian landowners and lessees and a paper mill. The plaintiff class brought the action alleging that the mill discharged toxic waste into the river. The settlement agreement provided that the paper mill be released from liability for,

> *all future claims*, demands, rights of action and causes of action of *every kind and character*, whether arising in *law or equity*, both against the Settling Defendant and all other persons and entities, which each Class member, his, her or its heirs, executors, administrators, successors, and assigns, ever had, now have or hereafter

may acquire, by reason of, arising out of, or in any way relating to [the discharge from the paper mill].

*Id.* at 521 (emphasis added). Therefore, the only case that has been cited bars the class members, their children, and their grandchildren, from bringing all future, unknown causes of action relating in any way to the mill's discharge. *See id.* at 523–24. In the case before this Court, the plaintiff class is not precluded from bringing individual suits for damages or equitable relief and is not precluded from bringing class action equitable claims indefinitely, just for the two years that the Settlement Agreements are in effect. The Court finds that a moratorium on class action equitable suits for two years, while plaintiffs and defendants work together to develop a better child welfare system, is fair, reasonable, and adequate.

### 3. The *Marisol* Class Representatives Adequately Represent the Plaintiff Class, Including the Joel A. Plaintiffs

■ The Joel A. plaintiffs also argue that as none of the *Marisol* named plaintiffs are gay, lesbian, bisexual, or transgendered, and none have alleged an absence of safe placements due to intense bias-related victimization and discrimination, that none of the named plaintiffs adequately represent their concerns.

The plaintiff class that the Joel A. plaintiffs purport to represent is comprised of gay, lesbian, bisexual, and transgendered children, and children not so self-labeled but experiencing feelings of same-sex attraction or gender atypicality, or who are questioning or confused about their sexual orientation or gender and are in the custody of the *Marisol* defendants. The Court finds that these persons are represented in the *Marisol* litigation by the named plaintiffs representing Subclass III.

The Joel A. plaintiffs are attempting to argue at this late date that the adequacy prong of class certification was not met. This issue has already been decided by this Court, *Marisol A. v. Giuliani*, 929 F.Supp. 662 (S.D.N.Y.1996), and affirmed by the Second Circuit, 126 F.3d 372 (2d Cir.1997). The

named plaintiffs do adequately represent the Joel A. plaintiffs. While the Court recognizes that the Joel A. plaintiffs have concerns regarding placement because of their sexual orientation, the Court also recognizes that there are numerous children who have specific concerns regarding personal characteristics, attributes, conditions, or life positions. For instance, teenage girls who have children are in a difficult situation when both they and their children need placement. It is not easy to find foster care facilities equipped for both teenagers and their young children. Additionally, as noted in the *Wilder* litigation, some children face difficulties in placement due to race and religion. This Court finds, however, that the named plaintiffs in *Marisol* adequately represent all of these children and have standing to do so. Therefore, the Court does not find the lack of a named plaintiff who is identical to the proposed named plaintiffs in *Joel A.* to be a reason to disapprove of the Settlement Agreements.

### B. The Legal Aid Society

The Legal Aid Society, through its Juvenile Rights Division, represents a large number of children in cases before New York City Family Courts involving child abuse and neglect, termination of parental rights, status offenses, delinquency and other proceedings affecting children's rights and welfare. The Juvenile Rights Division attorneys and social workers handle 45,000 child-related cases annually. In a written submission to the Court dated January 15, 1999, Monica Drinane wrote on behalf of The Legal Aid Society: "[w]e wish to make clear, on behalf of our clients, that we applaud and support the goals of this most novel and innovative agreement." Legal Aid Society letter of January 15, 1999 at 4; *see also* Transcript of Fairness Hearing of January 25, 1999, Statement of Monica Drinane on behalf of The Legal Aid Society, at 64.

While supporting the goals of the City Settlement Agreement and the functions of the Advisory Panel, The Legal Aid Society does raise concerns about the covenants not to sue and releases in the City Settlement Agreement. The Court has addressed most of these concerns above, *supra* Discussion

Section IV.A., and therefore will only address The Aid Society's concern that the City Settlement Agreement prevents damages actions.

The releases in the City Settlement Agreement only prevent equitable class actions based on claims, occurring prior to the Court's approval of the Settlement Agreement, arising from or in any way relating to any equitable claim which is or could have been stated in the pleadings. On the expiration of the Settlement Agreement, equitable class actions are barred if based on claims occurring during the period of the Agreement arising from or relating to any equitable claim which is or could have been stated in the litigation as described in Plaintiffs' Statement of Claims to be Tried, set forth in the Pre–Trial Order dated July 16, 1998. These releases do not bar individual equitable claims seeking relief tailored to the individual. Nor do they bar, as is The Legal Aid Society's concern, any form of damages actions.

The Court does not find these releases to overburden plaintiffs. To the contrary, the Court recognizes the achievement the City Settlement Agreement reaches by permitting unfettered access to ACS information and personnel and that this could not be accomplished without some guarantees against further equitable class action suits during and related to the time period when this open access occurs.

## C. OHEL Children's Home & Family Services ("OHEL")

OHEL, a private contract agency which was a defendant in the *Wilder* case and a signatory to the *Wilder* Stipulation of Settlement, objects to the dismissal of *Wilder* unless paragraph 61 of the *Wilder* Stipulation of Settlement is included in the *Marisol* City Settlement Agreement. Paragraph 61 of the *Wilder* Stipulation of Settlement specifically addressed OHEL's interest in providing for children in foster care whose religious needs and customs so pervade every aspect of their lives that they require services in an agency solely dedicated to those needs. This Court does not find OHEL's position, that without the inclusion of this paragraph OHEL's clients' rights will be severely impaired, persuasive.

The *Wilder* Stipulation of Settlement was at no point intended to continue indefinitely. *See* Stipulation of Settlement, ¶¶ 79–81; *see also* Memorandum Decision of Hon. Robert J. Ward dated July 1, 1998, 78 Civ. 957(RJW), (stating that the Court had "no intention of continuing the Stipulation indefinitely . . ."). Therefore, paragraph 61 of the Stipulation of Settlement was always intended to be a time-limited provision.[16]

With regard to paragraph 61 of the *Wilder* Stipulation of Settlement, William Bell, Deputy Commissioner for the Division of Child Protection at ACS, states that OHEL is the only agency specially designated by ACS to care for children "whose religious beliefs pervade and determine the entire mode of their lives." Declaration of Gail Rubin in Support of the Settlement and in Opposition to the Motion by the Joel A. Plaintiffs to Intervene, Ex. E.: Affidavit of William Bell dated January 21, 1999, ¶ 2 (quoting Stipulation of Settlement, ¶ 61). Bell also stated that ACS considers whether a child's or family's religious beliefs determine their entire mode of living and places children accordingly, and that ACS has no plans to change its placement practices in any manner that would make them inconsistent with Paragraph 61 of the Stipulation of Settlement. *Id.* at ¶¶ 4–5.

In any event the Court finds that OHEL's concerns are adequately addressed in the *Marisol* City Settlement Agreement, which states that "children in placement have . . . the right to practice their own religion while in placement." Further, OHEL retains the protection for such Free Exercise in foster care placement as is offered under state law. *See* Social Services Law § 373. Since OHEL's concerns are addressed in the *Marisol* City Settlement Agreement, the City defendants have no intention of altering their practice concerning placement of children

---

**16.** As discussed *supra* Discussion Section III., City defendants moved to have *Wilder* dismissed, claiming that the Stipulation of Settlement expired. While this Court denied City's motion, an appeal is pending.

whose religious beliefs determine their entire mode of living, and the *Wilder* Stipulation of Settlement was never intended to continue indefinitely, the fact that the *Marisol* City Settlement Agreement does not incorporate paragraph 61 of the *Wilder* Stipulation of Settlement does not render the City Settlement Agreement unfair to OHEL.

### D. OTHER COMMENTS AND OBJECTIONS

The remaining five comments were either in favor of the Settlement Agreements, sought specific relief from the Court, or discussed short-comings of New York City's foster care system as a whole but did not specifically address the terms of the Settlement Agreements.

The Director of Child Welfare for the Diocese of Brooklyn, Barbara Conley, and the Director of Child Care for the Archdiocese of New York, Sr. Una McCormack, jointly wrote on behalf of their agencies in support of the approval of *Marisol* and the dismissal of *Wilder.* These 21 agencies endorse the *Marisol* Advisory Panel and will likely submit recommendations to the panel members. Further, these agencies observe how very different today's foster care system is than the one existing when the *Wilder* lawsuit was initiated and point out that the *Marisol* Settlement Agreements take this into consideration.[17]

Three individuals commented on the operations of ACS. Alvin A. Rivers, Sr., a grandfather of two children in the custody of ACS, stated at both the fairness hearing and in a written submission to the Court that he did not believe that ACS was capable of complying with a settlement agreement. The Court finds the City Settlement Agreement terms which contemplate ACS acting in bad faith, to amply provide for judicial enforcement of the Settlement Agreement. Rubin Quick discusses the problems he has encountered as a single male parent, but he does not

comment specifically on the Settlement Agreements. John L. Harris, Sr. objects to the Settlement Agreements and is specifically concerned that the Advisory Panel has insufficient power to change the system. The Court has already addressed this concern, finding that the Advisory Panel and the procedures instituted by the City Settlement Agreement provide for a novel approach to effecting substantial reform in the whole of ACS.

### CONCLUSION

For the foregoing reasons, the Court finds the *Marisol* Settlement Agreements and the dismissal of *Wilder* to be fair, reasonable, and adequate. Accordingly, the Court approves the *Marisol* Settlement Agreements and grants the motion to dismiss *Wilder.*

Order and Final Judgments signed.

---

17. The Roman Catholic Archdiocese of New York, represented by Lawrence F. McGovern, without commenting on the substance of the Settlement Agreements, requests that the parties continue to treat the Roman Catholic Archdiocese of New York child care agencies as interested parties, as they were in *Wilder.* The Court, during the fairness hearing, requested that the parties keep the child care agencies associated with the Roman Catholic Archdiocese of New York abreast of the reports filed by the Advisory Panel. Further, the Roman Catholic Archdiocese child care agencies can communicate their concerns to the Advisory Panel directly.