**MARISOL A., by her next friend, Rev. Dr. James Alexander FORBES, Jr., et al., Plaintiffs,**

v.

**Rudolph W. GIULIANI, Mayor of the City of New York, et al., Defendants.**

**No. 95 CIV. 10533(RJW).**

United States District Court, S.D. New York.

Aug. 30, 2000.

Children's Rights, Inc., New York City (Marcia Robinson Lowry, Susan Lambiase, Kim E. Murdock, Jeffrey K. Powell, of Counsel), Lawyers for Children, New York City (Karen J. Freedman, of Counsel), Schulte Roth & Zabel LLP, New York City (Daniel J. Kramer, Jess A. Velona, of Counsel), for Plaintiffs.

Michael D. Hess, Corporation Counsel of the City of New York, New York City (Gail Rubin, Grace Goodman, John Woods, of Counsel) for Defendants.

## OPINION

WARD, District Judge.

Plaintiffs, who were represented by Children's Rights, Inc. ("CRI"), Schulte, Roth and Zabel, LLP ("Schulte"), and Lawyers for Children, Inc. ("LCI"), move for attorneys' fees and expenses pursuant to 42 U.S.C. § 1988. They initially sought $9,359,569.39 in fees and out-of-pocket expenses, but later reduced their request to $7,997,313.67. For the reasons hereinafter stated, the Court awards plaintiffs $5,835,116.78 in attorneys' fees and expenses.

## BACKGROUND

The Court assumes familiarity with the underlying facts of this case, which are more fully reported in *Marisol A. v. Giuliani*, 929 F.Supp. 662 (S.D.N.Y.1996) (denying motion to dismiss and certifying class) ("*Marisol I*"), *aff'd*, 126 F.3d 372 (2d

Cir.1997), and *Marisol A. v. Giuliani*, 185 F.R.D. 152 (S.D.N.Y.1999) (approving settlement agreements) ("*Marisol* II"), *aff'd sub nom., Joel A. v. Giuliani*, 218 F.3d 132 (2d Cir.2000). Nevertheless, the Court will provide a brief overview of the facts which are relevant to the instant motion.

Plaintiffs filed a complaint in this Court on December 13, 1995, alleging systemic deficiencies in the administration of the New York City child welfare system. The complaint sought declaratory and injunctive relief against various officials of the City of New York (the "City defendants" or "defendants") and various officials of the State of New York who were responsible for the operation or oversight of New York's child welfare system.[1]

At the same time they filed their complaint, plaintiffs moved for class certification seeking to represent a class consisting of all children who were in or would be in the custody of the City's child welfare system, who were or would be at the risk of abuse or neglect, and whose status was known to the responsible City agency. Defendants moved to dismiss the complaint and opposed the motion for class certification. The Court denied defendants' motion to dismiss and granted plaintiffs' motion for class certification in an opinion dated June 18, 1996. *See generally Marisol* I, 929 F.Supp. 662.

On the eve of trial, which was to commence on July 27, 1998, the parties informed the Court that they were engaged in settlement negotiations. The trial was adjourned and on December 2, 1998, after four months of negotiations, two Settlement Agreements were filed with the Court. One Settlement Agreement was between plaintiffs and the City defendants and the other was between plaintiffs and the State. The Court approved the Settlement Agreements on March 31, 1999. *See generally Marisol* II, 185 F.R.D. 152.

1. Although the original complaint named both New York City and New York State officials as defendants, the current motion for attor-

The Settlement Agreement between plaintiffs and the City defendants established an Advisory Panel of experts in the child welfare field. *Id.* at 157. The Administration for Children's Services ("ACS") agreed to cooperate with the Advisory Panel and to provide the Panel with full access to information, documents, and personnel. *Id.* at 158. The Advisory Panel is required to produce reports to determine whether ACS is acting in good faith in making efforts toward reform in certain areas. *Id.* If the Advisory Panel determines that ACS is not acting in good faith, plaintiffs may seek judicial relief. *Id.* The City Settlement Agreement, which expires on December 15, 2000, contains certain limitations on the filing of lawsuits through covenants not to sue and release provisions. *Id.* at 158–59.

Plaintiffs filed the instant motion while an appeal of the Court's approval of the Settlement Agreements was pending. The Court delayed ruling on the motion until the appeal was decided. The Court's decision was affirmed on July 10, 2000.

## DISCUSSION

In federal civil rights actions, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). The parties agree that plaintiffs are prevailing parties for purposes of § 1988. Therefore, the only issue remaining is determining an award of reasonable attorney's fees.

### I. Calculating Fees With the "Lodestar" Method

 "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The result of this

neys' fees is against the City defendants only, plaintiffs having already settled the issue of attorneys' fees with the State.

calculation, the so-called "lodestar" figure, is presumed to be the reasonable fee. *See LeBlanc–Sternberg v. Fletcher,* 143 F.3d 748, 764 (2d Cir.1998) (citations omitted). Plaintiffs have the burden of submitting evidence supporting the hours worked and rates claimed. *Hensley,* 461 U.S. at 433, 103 S.Ct. 1933. If the documentation is inadequate, for example, if it reflects excessive or redundant time, the court may reduce the award accordingly. *Id.* at 433–34, 103 S.Ct. 1933.

The Court will first determine plaintiffs' attorneys' reasonable hourly rates. It will then decide how many hours were reasonably expended on the litigation and consider whether any reduction in the lodestar amount is warranted.

### A. Calculating the Reasonable Hourly Rate

■ In determining the reasonable hourly rate to be applied, the Court should look to market rates " 'prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.' " *Gierlinger v. Gleason,* 160 F.3d 858, 882 (2d Cir.1998) (quoting *Blum v. Stenson,* 465 U.S. 886, 896 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). The relevant community to which the court should look is the district in which the case was brought. *See In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 226, 232 (2d Cir.1987). The rates used by the Court should be " 'current rather than historic hourly rates.' " *Gierlinger,* 160 F.3d at 882 (quoting *Missouri v. Jenkins,* 491 U.S. 274, 284, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989)).

■ Furthermore, non-profit civil rights attorneys should receive a " 'fully compensatory fee,' " *Jenkins,* 491 U.S. at 286, 109 S.Ct. 2463 (quoting *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933), "comparable to what 'is traditional with attorneys compensated by a fee-paying client.' " *Id.* (quoting S.Rep. No. 94–1011, p. 6 (1976), U.S.Code Cong. & Admin. News 1976, pp. 5908, 5913); *see also Blum,* 465 U.S. at 895, 104

S.Ct. 1541 ("The statute and legislative history establish that 'reasonable fees' under § 1988 are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel.").

■ Plaintiffs are also entitled to seek fees for paralegal services. *See Jenkins,* 491 U.S. at 286–87, 109 S.Ct. 2463; *United States Football League v. National Football League,* 887 F.2d 408, 415–16 (2d Cir. 1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1116, 107 L.Ed.2d 1022 (1990). Like the work performed by attorneys, the work performed by paralegals is billed by using the prevailing hourly rate for paralegal services in the community. *United States Football League,* 887 F.2d at 416.

■ After researching recent fee awards in civil rights cases, the Court finds that a reasonable rate scale is as follows: $350 for attorneys with more than fifteen years of experience, $300 for attorneys with ten to fifteen years of experience, $230–250 for attorneys with seven to nine years of experience, $180–200 for attorneys with four to six years of experience, and $130–150 for attorneys with one to three years of experience. *See, e.g., Robinson v. Instructional Sys., Inc.,* 105 F.Supp.2d 283, 286–87 (S.D.N.Y.2000) ($250 for attorney with fifteen years of experience and $175 for attorney with four to five years of experience in Title VII case); *Pascuiti v. New York Yankees,* 108 F.Supp.2d 258, 266 (S.D.N.Y.2000) ($250 for attorneys at small firm with twenty-nine and twenty-eight years of experience); *National Helicopter Corp. of America v. City of New York,* 96 Civ. 3574, 1999 WL 562031, at *6 (S.D.N.Y. July 30, 1999) ($300 for partners and $140 for associates is reasonable for attorneys at large law firm); *Ward v. New York City Transit Auth.,* 97 Civ. 8550, 1999 WL 446025, at *10 (S.D.N.Y. June 28, 1999) ($300 for experienced civil rights litigator, $175, $150, and $125 for associates with varying

levels of experience); *Skold v. American Int'l Group, Inc.*, 96 Civ. 7137, 1999 WL 405539, at *7 (S.D.N.Y. June 18, 1999) ($400 for experienced civil rights litigator who provided overall direction and strategy, $275 for attorney who served as lead counsel, $225 for attorney who served as co-lead counsel, and $175 for associate), *aff'd*, 205 F.3d 1324 (2d Cir.2000); *Perry v. S.Z. Restaurant Corp.*, 95 Civ. 5424, 1999 WL 370648, at *1 (S.D.N.Y. June 8, 1999) ($275–300 for senior partner, $250 for senior associate, $195–225 for junior associate); *Rodriguez v. McLoughlin*, 84 F.Supp.2d 417, 421–23 (S.D.N.Y.1999) ($425 for senior partner at large firm who was an experienced civil rights lawyer, $240 for attorney at large firm with four years of experience, and $175 for attorney at large firm with two years of experience); *TM Park Ave. Assocs. v. Pataki*, 44 F.Supp.2d 158, 166–68 (N.D.N.Y.1999) (applying Southern District rates and awarding $275 to senior partners at large firms, $200 for senior associates, and $175 for junior associates), *vacated on other grounds*, 214 F.3d 344 (2d Cir.2000); *Broome v. Biondi*, 17 F.Supp.2d 230, 237 (S.D.N.Y.1997) ($295–320 for senior partners at large firm, $290 for junior partners, and $175–265 for associates based on varying levels of experience); *Williams v. New York City Hous. Auth.*, 975 F.Supp. 317, 323 (S.D.N.Y.1997) ($250 for junior partners, $200 for senior associates, $150 for mid-level associates, and $135 for junior associates); *Wilder v. Bernstein*, 975 F.Supp. 276, 282 (S.D.N.Y.1997) (awarding attorneys at CRI $300 for M. Lowry, $220 for S. Lambiase, and $130 for R. Kimura); *Kim v. Dial Serv. Int'l, Inc.*, 96 Civ. 3327, 1997 WL 458783, at *16–17 (S.D.N.Y. Aug.11, 1997) ($250 for attorney with eighteen years of experience and $175 for attorney with five years of experience), *aff'd*, 159 F.3d 1347 (2d Cir.1998), *cert. denied*, 525 U.S. 1140, 119 S.Ct. 1030, 143 L.Ed.2d 39 (1999); *Collins v. Stolzenberg*, 970 F.Supp. 303, 304 (S.D.N.Y.1997) ($250 for experienced civil rights litigator); *Bridges v. Eastman Kodak Co.*, 91 Civ. 7985, 1996 WL 47304, at *11 (S.D.N.Y. Feb.6, 1996) ($250 for attorneys with thirty and twenty years of experience in civil rights litigation and $200 for attorney with seven years of experience), *aff'd*, 102 F.3d 56 (2d Cir. 1996), *cert. denied*, 520 U.S. 1274, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997); *Helbrans v. Coombe*, 890 F.Supp. 227, 233–34 (S.D.N.Y.1995) ($350 for experienced civil rights litigator, $300 for senior partners, $250 for junior partners, $225 for senior associates, $175 for mid-level associates, and $125 for junior associates).

### 1. CRI

With respect to Marcia Robinson Lowry, the director of CRI and lead attorney in this case, plaintiffs request an hourly rate of $450. Notwithstanding the rate scale described above, Ms. Lowry is awarded $375 per hour as lead attorney and because she has great expertise in child welfare litigation. Ms. Lowry has been working on child welfare matters since the early 1970s. She is the founder and executive director of CRI and brings with her a level of experience in, and understanding of, the issues that undoubtedly conferred a considerable benefit on the plaintiffs. The remaining CRI attorneys' fees will be calculated as follows:

| Attorney | Average Level of Experience [2] | Hourly Rate |
| --- | --- | --- |
| R. Firestein | 15+ | $350 |
| J. Kirklin | 15+ | 350 |
| M. Stone | 15+ | 350 |
| R. Dahlberg | 11 | 300 |
| S. Lambiase | 10.5 | 300 |
| E. Rodriguez | 7 | 230 |
| D. Dorsky | 7 | 230 |
| M. Peters | 6 | 200 |
| K. Schiller | 6 | 200 |
| C. Levine | 5.5 | 200 |
| E. Thompson | 5 | 190 |
| D. Eviatar | 4.5 | 190 |
| M. Delone | 3 | 150 |
| R. Park | 3 | 150 |
| A. Gilbert | 3 | 150 |
| R. Levine | 3 | 150 |
| R. Kimura | 2 | 140 |
| A. Park | 1 | 130 |
| S. Nossel | 1 | 130 |

**2.** Plaintiffs recognize that each attorney should receive fees based on the average of

In addition, CRI seeks fees for the work performed by its paralegals at an hourly rate of $75. Defendants oppose this rate and argue that the prevailing rate in this district is $60–75. In *Wilder*, this Court approved an hourly rate of $60–75 for paralegals at CRI. 975 F.Supp. at 282. Soon after *Wilder*, this Court approved an hourly rate of $75 for paralegals in another civil rights action. *See Williams*, 975 F.Supp. at 323. The cases cited by defendants indicate that the prevailing market rate for paralegal services is still within the range of $60–75. Since an hourly rate of $75, is within the range proposed by defendants and appears reasonable, the Court has determined to apply that rate to this case.[3]

### 2. Schulte

Plaintiffs propose rates for Schulte in accordance with the hourly rates actually charged to the firms' fee-paying clients in the normal course of the firm's business. The hourly rates requested for Schulte range from $140 for first year associates to $515 for the senior partner, David Brodsky. According to the affidavit of Mr. Brodsky, these rates are consistent with those charged by other large New York City law firms.

Based on the cases cited above, however, the Court finds that a more reasonable rate scale is the one the Court used for CRI attorneys. Because Mr. Brodsky, a seasoned litigator with over thirty years of experience, served as co-lead counsel with Ms. Lowry and made a significant contribution to the settlement of the case, he is also awarded $375 per hour.

Although, courts have recognized that attorneys at large "Wall Street" law firms may receive higher compensation due to the higher overhead and additional costs associated with practice at such firms, *see, e.g., Rodriguez*, 84 F.Supp.2d at 421–22 (and cases cited therein), the Court finds that the rate scale used above adequately takes into account these additional costs and is consistent with hourly rates awarded to other large firms in this district. *See, e.g., National Helicopter*, 1999 WL 562031, at *6 (finding that rates of $300–450 for partners and $140–295 for associates at Dewey Ballantine are reasonable at the lower end of those scales); *Rodriguez*, 84 F.Supp.2d at 422 (awarding attorneys at Chadbourne & Parke $425 for senior partner who was an experienced civil rights lawyer, $240 for attorney with four years of experience, and $175 for attorney with two years of experience); *TM Park Ave. Assocs.*, 44 F.Supp.2d at 166–68 (applying New York City rates and awarding senior partner at Stroock Stroock & Lavan $275 hourly rate instead of requested $460 to $505 rate, and awarding partners at Debevoise & Plimpton and Rosenman & Colin $275 hourly rate, while awarding $200 to senior associates and $175 to junior associates).[4]

his or her level of experience over the course of the litigation, as opposed to their current level of experience. *See, e.g., New York State Nat'l Org. for Women v. Terry*, 94 F.Supp.2d 465, 473 (S.D.N.Y.2000).

3. Plaintiffs did not request hourly rates higher than $75 for CRI's paralegals or provide any information regarding the level of experience for CRI's paralegals. Therefore, the Court will apply an hourly rate of $75 for all of CRI's paralegals. However, and as discussed in more detail below, plaintiffs requested higher rates for Schulte's paralegals and provided the Court with resumes describing their experience. Thus, unlike CRI's paralegals, the Court is able to determine that Schulte's

paralegals are entitled to a higher hourly rate which is commensurate with their level of experience.

4. Plaintiffs have also provided the Court with "A firm-by-firm sampling of billing rates nationwide," published in the National Law Journal during the week of December 27, 1999 to January 3, 2000. Of the eleven New York City firms that responded to the survey, Schulte charged the second highest hourly rate for its partners. Other than Skadden, Arps, Slate, Meagher & Flom, none of the other New York firms on the list charged over $500 as a hourly rate for its partners and only one other firm charged as much as $500.

Therefore, in addition to Mr. Brodsky's hourly rate of $375, the Schulte attorneys' fees will be calculated according to the following hourly rates:

| Attorney | Average Level of Experience | Hourly Rate |
|---|---|---|
| J. Velona | 9 | $250 |
| K. Schiller | 8 | 240 |
| A. Freedman | 7 | 230 |
| S. Davidson | 3 | 150 |
| A. Passanante | 2 | 140 |
| E. Schijf | 1 | 130 |
| M. Craner | 1 | 130 |
| S. Aronowitz | 1 | 130 |
| J. McBride | 1 | 130 |

Like CRI, Schulte also seeks fees for work performed by its paralegals. However, unlike CRI, Schulte seeks hourly rates far in excess of $75 per hour. According to Schulte, its paralegals' hourly rates range from $65–150, depending on level of experience. Plaintiffs have cited several cases in which courts have awarded more experienced paralegals at large law firms an hourly rate higher than $75, but none awarded paralegals as much as the $150 requested by plaintiffs for Schulte paralegals. *See, e.g., Rodriguez,* 84 F.Supp.2d at 427 (awarding paralegals between $75 and $130 per hour depending on level of experience). The Court will apply the following rates to Schulte's paralegals, which are reasonable and within the range of rates awarded in other cases:

| Paralegal | Average Level of Experience | Hourly Rate |
|---|---|---|
| K. Brombach | 15 | $110 |
| M. Alston | 14 | 110 |
| D. McCracken | 8 | 90 |
| P. Hamlen | 6 | 75 |
| Others | - | 75 [5] |

### 3. LCI

Karen Freedman is the co-founder and executive director of LCI. She has an average of seventeen years of experience over the course of the litigation, and therefore, will be compensated at an hourly rate of $350.

[5] Because Schulte did not provide resumes for a number of its paralegals, it is unclear how much experience they have. Therefore,

### B. Number of Hours Reasonably Expended

■ In determining whether the hours expended by the parties was reasonable, the Court must

"examine the hours expended by counsel and the value of the work product of the particular expenditures to the client's case.... In making this examination, the district court does not play the role of an uninformed arbiter but may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties."

*Gierlinger,* 160 F.3d at 876 (quoting *DiFilippo v. Morizio,* 759 F.2d 231, 235–36 (2d Cir.1985)). The court may exclude hours that it determines were "excessive, redundant, or otherwise unnecessary." *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933.

■ Some reduction in plaintiffs' fee award is warranted. The Court will address each area of contention below and explain its reasoning with regard to any reduction. However, rather than reducing a certain number of unreasonably billed hours, the Court will make an across-the-board percentage cut in plaintiffs' fee award as is necessary and appropriate. *See, e.g., In re Agent Orange,* 818 F.2d at 237 (stating that "in cases in which substantial numbers of voluminous fee petitions are filed, the district court has the authority to make across-the-board percentage cuts in hours 'as a practical means of trimming fat from a fee application.'" (quoting *New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1146 (2d Cir.1983)); *see also United States Football League,* 887 F.2d at 415 (approving a percentage reduction of total fee award to account for vagueness in documentation of certain time entries).

the Court will calculate their lodestar amount using the $75 rate that it will use for CRI's paralegals.

### 1. Time Spent on the Case Against the State

Defendants argue that they should not be required to pay fees for hours spent by plaintiffs litigating their claims against the State. Plaintiffs agree to withdraw 113 hours that CRI spent on negotiating and finalizing the State Settlement Agreement but continue to request compensation from the City defendants for other hours spent litigating against the State.

 The allocation of fee liability between defendants is not mandated but rather is within the discretion of the district court. *See Koster v. Perales,* 903 F.2d 131, 139 (2d Cir.1990). In determining how to allocate fee liability, district courts have considered such factors as the relative culpability of the parties and the proportion of time spent litigating against each defendant. *Id.* (citations omitted). When allocating fees, the Court should " 'make every effort to achieve the most fair and sensible solution that is possible.' " *Id.* (citations omitted).

 In the present case, a significant amount of plaintiffs' work was performed in furtherance of their case against both the City defendants and the State. Even where plaintiffs' time records seem to describe work done solely in relation to the State defendants, that work actually aided plaintiffs in their case against the City defendants. It is fair and reasonable for plaintiffs to recover fees from the City defendants for all the work that assisted plaintiffs in their case against the City even if the records describe work against the State only.

Some work was performed solely in relation to plaintiffs' case against the State. It would be unfair to require the City defendants to pay these fees. However, it would be difficult, if not impossible, to specifically identify the time spent by plaintiffs on issues unique to the State. Therefore, the Court will take this matter into consideration when it reduces plaintiffs' overall fee request.

### 2. Time Spent on "Clerical" or "Secretarial" Tasks

Defendants argue that plaintiffs unreasonably billed attorneys' and paralegals' rates for tasks such as copying, faxing, typing, and creating and maintaining a database. They also contend that plaintiffs erroneously billed for time spent serving and filing papers. In response, plaintiffs have withdrawn 180.20 of CRI's hours and 40.90 of Schulte's hours which were spent on clerical activities. However, they oppose any reduction in the amount of time spent on what they characterize as "non-clerical work expended on the management and organization of the massive volume of documents and the maintenance of a deposition database." Plaintiffs' Reply Memorandum of Law in Support of Their Motion for Attorney's Fees and Expenses, at 47 ("Pl.Br."). Plaintiffs also oppose any reduction in hours expended serving and filing papers.

 This Court has previously recognized that clerical and secretarial services are part of overhead and are not generally charged to clients. *Williams,* 975 F.Supp. at 324 (citations omitted). Plaintiffs have appropriately reduced their request in recognition of that fact. The Court agrees with plaintiffs, however, that the work performed in furtherance of organizing the countless number of documents in this case and maintaining a litigation-related database is fully compensable. As plaintiffs state, this work required a comprehensive understanding of, and familiarity with, the substance of the case. Furthermore, plaintiffs have shown that such work is customarily billed to fee-paying clients. *See* Reply Affirmation of Jess A. Velona in Support of Application for Attorneys' Fees and Expenses, at ¶ 35 ("Velona Aff."). Therefore, the Court will not make any further reduction to reflect time spent on these tasks.

 However, time spent serving and filing papers, along with other similar ad-

ministrative tasks is not usually considered recoverable. *See Broome,* 17 F.Supp.2d at 236 (citations omitted). While several of plaintiffs' time entries indicate tasks that are both administrative and substantive, such as "revising and finalizing deliberative privilege reply brief, and production and filing of same," several of the entries are purely administrative, such as "assist CL to Cahill Gordon to bind appellate brief and to file brief at 2nd circuit." The Court will take this into account when it adjusts plaintiffs' fee award.

### 3. Time Spent on "General Organizational Matters"

Defendants next argue that plaintiffs have unreasonably billed for general organizational matters. For example, they point out that plaintiffs' attorneys spent 100 hours recruiting staff and pro bono counsel, and that they unreasonably billed for time spent on intake calls, staff meetings, informational interviews, meetings with other organizations, raising funds, acknowledging gifts, and learning Southern District rules.

 Plaintiffs respond by withdrawing 94.10 hours spent recruiting pro bono legal assistance and 75.40 hours expended on other general organizational matters. They maintain, however, that they are entitled to fees for hours spent at staff meetings regarding defendants' practices, and interviewing individuals who had first hand experience with the child welfare system because information derived from these activities was essential to the prosecution of their claims. The Court agrees that these tasks are not general organizational matters and are compensable.

 In addition, defendants contend that CRI spent 156 hours, and Schulte spent 211 hours, reviewing mail, for which they should not be compensated. This Court has recognized that "[a]ttorneys must review their mail to remain apprised of events in a case. It would be irresponsible of them to delegate that task." *Wil-*

*der,* 975 F.Supp. at 285. After reviewing plaintiffs' records, the Court finds that, not only was it reasonable for plaintiffs' attorneys to review their mail, but in many instances, the entries describe substantive work, such as "reviewing case activities, court hearing transcript, correspondence and pleadings from during week's vacation." Therefore, the Court will not reduce plaintiffs' requested hours for the time their attorneys spent reviewing mail.

### 4. Time Reflected in Non–Contemporaneous Records

Defendants argue that one of CRI's attorneys, Suzanne Nossel, did not keep contemporaneous time records and is therefore, not entitled to compensation for all of the 1,532 hours she expended. Defendants point out that Ms. Nossel's time records contain entries such as "calculated time for past few weeks," and also contain several errors, which demonstrates that she did not keep her records contemporaneously. Plaintiffs explain that on occasion, especially when she was away from the office, Ms. Nossel kept contemporaneous handwritten records of tasks she performed and later entered them into the computer billing program.

In *Carey,* the court stated, "contemporaneous time records are a prerequisite for attorney's fees in this Circuit." 711 F.2d at 1147. The court then explained that in order to be deemed contemporaneous, the records "should specify, for each attorney, the date, the hours expended, and the nature of the work done." *Id.* at 1148.

This Court has examined the time records submitted for Ms. Nossel's work and finds that they satisfy all of the requirements set forth in *Carey.* Each entry submitted for Ms. Nossel indicates the date she performed her work, the hours spent on the work, and a detailed description of the work performed. Where Ms. Nossel's time records state, "calculated time for past few weeks," she was not inputting time spent on substantive work, rather she was inputting time spent entering her contemporaneous handwritten records into the billing program. Further-

more, the fact that her time entries contain several errors, for example, inputting time spent at a court conference on a date which corresponds to a Sunday when the court was not in session, is an insufficient basis for concluding that she did not keep contemporaneous time records for 1,532 hours of work.[6]

### 5. Time Spent Unreasonably and Not Advancing the Case

Defendants contend that plaintiffs should not be compensated for time spent on case preparation that ultimately appeared to be unnecessary and arguing motions in which they were unsuccessful. Plaintiffs agree to withdraw numerous hours, but maintain that some of the work challenged by defendants is fully compensable. The Court will address each matter on which the parties continue to disagree.

#### a. Dean Mary Davidson

Plaintiffs expended 157 hours working with Dean Mary Davidson of Rutgers University School of Social Work, whom plaintiffs intended to use as an expert at trial. However, plaintiffs ultimately decided to withdraw Dean Davidson as one of their experts. Plaintiffs nevertheless contend that her assistance in reviewing plaintiffs' case files was indispensable and therefore, reasonable and compensable. Defendants argue that the time spent with Dean Davidson should be eliminated because the work she performed was presumably duplicated by plaintiffs' other expert, Katherine Briar–Lawson.

The Court finds that the time spent with Dean Davidson is fully compensable. It is a reality of complex litigation such as this that both parties will engage in a great deal of case preparation which will not necessarily lead to information that will be used at trial. Such work may include reviewing documents, interviewing witnesses, and, like the present case, working with experts. So long as a reasonable attorney would engage in the work under similar circumstances, the Court will not prevent plaintiffs from recovering their fees. *See, e.g., David C. v. Leavitt*, 900 F.Supp. 1547, 1560 (D.Utah 1995) (finding that time spent with an expert who did not testify at trial was compensable "so long as the time was reasonably expended in litigation of the plaintiff's case") (citing *Whalen v. Unit Rig, Inc.*, 974 F.2d 1248, 1254 (10th Cir.1992), *cert. denied*, 507 U.S. 973, 113 S.Ct. 1417, 122 L.Ed.2d 787 (1993)).

The Court is satisfied that the work performed with respect to Dean Davidson was reasonable. Dean Davidson assisted plaintiffs in determining whether the named plaintiffs' foster care cases were being handled by the relevant City agencies pursuant to mandatory and accepted practices and procedures governing the foster care system. In doing so, she aided plaintiffs in the litigation even though she was withdrawn as a trial expert. Furthermore, there is no evidence suggesting that the work of plaintiffs' other expert, Ms. Briar–Lawson, was duplicative of Dean Davidson's efforts.[7]

#### b. Time Spent on Unsuccessful Motion to Dismiss Defendants' Interlocutory Appeal of Class Certification

Plaintiffs moved to dismiss defendants' interlocutory appeal of this Court's deci-

---

**6.** However, the Court finds that plaintiffs should not receive attorneys' fees for the work performed by Ms. Nossel while she was a judicial clerk in January 1997. Therefore, the Court will exclude 19.35 hours from Ms. Nossel's fee calculation.

**7.** The case on which defendants rely is inapposite. In *Bonner v. Guccione*, 94 Civ. 7735, 1997 WL 441910 (S.D.N.Y. Aug.6, 1997), *vacated in part on other grounds*, 178 F.3d 581 (2d Cir.1999), defendants argued that plaintiff should not recover fees associated with two experts because "they did not testify at trial *and their work was unnecessary.*" *Id.* at *11 (emphasis added). The court agreed, noting that plaintiff's first expert saw plaintiff for only a few hours and failed to conduct a thorough review, and plaintiff's second expert's report was seriously flawed. *Id.* Unlike the court in *Bonner*, this Court has determined that plaintiffs' expert was necessary and helpful to plaintiffs even though she was withdrawn as a trial expert.

sion granting class certification on the grounds that the appeal was untimely. After plaintiffs' motion was denied, *see Marisol A. v. Giuliani*, 104 F.3d 524 (2d Cir. 1996) ("*Marisol* III"), they filed a petition for certiorari, which was also denied. *See* 520 U.S. 1211, 117 S.Ct. 1694, 137 L.Ed.2d 821 (1997). Defendants argue that the 182 hours spent by plaintiffs on these motions should be eliminated from their fee application. Plaintiffs contend that their motion was at all times reasonable, and therefore, they are entitled to compensation for the time expended.

 As this Court recognized in *Terry*, if a plaintiff is ultimately successful in litigation,

> "she should not necessarily be denied fees for hours expended on interim stages of the case in which a ruling was made in favor of the party against whom she ultimately prevailed.... [T]he proper inquiry is not whether [plaintiff's] efforts on appeal itself were successful, but rather whether, in light of the circumstances of the litigation as a whole, those efforts were reasonable."

94 F.Supp.2d at 468 (quoting *Gierlinger*, 160 F.3d at 880). In *Terry*, plaintiffs unsuccessfully opposed a petition for certiorari to the Supreme Court and subsequently made a losing argument when the matter was remanded to the Second Circuit. *Id.* at 470. However, plaintiffs were ultimately successful in the litigation as a whole. In awarding fees to plaintiffs for their failed efforts, this Court recognized that their efforts were reasonable because, *inter alia*, the law on which their argu-

ments was based was not well-settled at the time. *Id.*

 In the present case, plaintiffs' efforts in moving to dismiss defendants' interlocutory appeal and their petition for certiorari were clearly reasonable. In denying plaintiffs' motion, the Second Circuit recognized that neither it nor the Supreme Court had squarely addressed the issue raised by plaintiffs. *See Marisol* III, 104 F.3d at 527. Furthermore, the Court agrees with plaintiffs that preventing them and other prevailing parties from recovering fees for unsuccessful efforts during the course of an otherwise successful litigation may discourage attorneys from zealously representing their clients and raising novel but reasonable arguments on their behalf. Therefore, the Court finds that plaintiffs are entitled to recover attorneys' fees for the work performed in connection with these motions.[8]

### c. Time Spent Moving For Contempt

 In January 1998, plaintiffs moved for contempt of an interim stipulation and order concerning overnights at one of the City's pre-placement centers, where children were taken to await placement in foster care. The interim stipulation mandated that no child be kept at the Laight Street Pre–Placement Center for more than one night in any thirty day period. While this litigation was ongoing, plaintiffs alleged that this provision was being violated.

The contempt motion was fully briefed, discovery was taken, and a five-day hear-

---

**8.** The Court also finds that plaintiffs' efforts to depose Mayor Giuliani and engage in other discovery efforts challenged by defendants were reasonable. Although plaintiffs seek to recover fees for discovery matters in which they failed to achieve their objective, their efforts were reasonable and they are entitled to recover their fees. For example, even though the Court granted defendants' motion for a protective order quashing the deposition of Mayor Giuliani, plaintiffs were pursuing what they reasonably believed to be a valid avenue of discovery. Plaintiffs believed that

Mayor Giuliani was the only source of information on matters important to their case, and although the Court disagreed, it cannot say that plaintiffs unnecessarily and unreasonably pursued this avenue of discovery.

Furthermore, the Court finds that plaintiffs reasonably spent ninety-nine hours preparing a motion for summary judgment, even though the motion was never filed. The work performed by plaintiffs in connection with the motion was done at the request of the Court, as was the decision not to file the motion.

ing was held. The Court found that defendants were not in contempt, concluding that the City had acted with reasonable diligence in its efforts to comply with the Interim Stipulation. *See* Hearing Transcript, at 875, attached to Declaration of Gail Rubin in opposition to Plaintiffs' Motion for Attorneys' Fees as Exhibit 23 ("Rubin Dec."). Defendants now argue that, given their efforts to comply, plaintiffs' time-consuming contempt litigation was unnecessary and unreasonable. The Court disagrees.

Plaintiffs were correct in believing that defendants were violating the terms of the interim stipulation concerning the pre-placement center. Defendants conceded that their actions were in violation of the express terms of the interim stipulation. *Id.* at 874. However, in order to find that defendants were in contempt, plaintiffs had to prove not only that defendants were in violation of the stipulation, but also that defendants were not reasonably diligent in their efforts to comply. *See id.* (citing *United States v. O'Rourke*, 943 F.2d 180, 189 (2d Cir.1991)). The Court declined to hold defendants in contempt because it found that they were reasonably diligent in their efforts to comply with the interim stipulation. *Id.* at 875. This finding by the Court may have saved defendants from being held in contempt, but it hardly renders plaintiffs' efforts unreasonable considering that the factual basis for bringing the motion was completely accurate.

### d. Time Spent on the "St. Vincent's Hospital and Medical Center Administration for Children's Services" Survey

In January 1998, a report submitted by two of plaintiffs' experts alleged that some children's lives were in jeopardy because

defendants failed to take appropriate actions on their behalf. The Court ordered plaintiffs to produce additional information in support of these allegations. Specifically, the Court directed plaintiffs to search for letters written to the ACS Commissioner concerning this matter and to compile a list of children whose lives were in jeopardy. In response, plaintiffs produced a statistical survey known as the St. Vincent's Hospital and Medical Center Administration for Children's Services Survey, which the Court characterized as an expert report. The Court granted defendants' motion in limine precluding this report because the report was filed late, twenty-one days after plaintiffs' expert reports were due. *See* Rubin Dec., Exhibit 25, at 8–9.

Defendants argue that the sixty-nine hours spent by plaintiffs on this issue should be eliminated. Plaintiffs respond by agreeing to withdraw half of these hours but inexplicably insist on being compensated for the other half. The Court finds that plaintiffs' efforts with regard to this issue were unreasonable, as they were not responsive to the Court's request and did not comply with the time-table set by the Court for compliance with its order. Therefore, the Court will eliminate the remaining hours spent by plaintiffs on this issue.[9]

### 6. Time Spent by Attorneys on "Paralegal Tasks"

Defendants contend that 196 of CRI's attorneys' hours and 77 of Schulte's attorneys' hours were spent on tasks that should have been delegated to paralegals. Therefore, defendants argue, fees for these hours should be calculated at paralegals' rates.

---

9. Because this matter constitutes such a miniscule portion of plaintiffs' overall fee request, the Court will deduct the remaining hours associated with this work instead of considering the matter when the Court makes an across-the-board reduction in plaintiffs' lodestar award. Accordingly, the Court will deduct the following hours spent by these attorneys on this matter (the other half was already deducted by plaintiffs): R. Firestein—.09 hours; M. Peters—18.52 hours; C. Levine—.40 hours; M. Delone 6.10 hours; S. Lambiase—.15 hours; S. Nossel—.81 hours; paralegals—8.82 hours.

Many of the tasks identified by defendants involve substantive legal work such as "Research re: substitution of next friend," and "find case and Shepardize case for CL." While a paralegal may have been able to perform these tasks, the tasks constitute work that attorneys typically engage in and there is no reason why the attorneys here should not be compensated at their hourly rate for choosing to do the work themselves.

Although some of the entries identified by defendants describe insignificant tasks such as "Retrieve documents that came up in conversation with Linda Stanch that I said I would fax," each of these tasks did not take up much of the attorneys' time. As the Court stated in *Wilder*, it would be unreasonable to expect attorneys to delegate every ministerial duty they perform because "[t]he time spent delegating the task could well exceed the time spent by the attorney" performing the task herself. 975 F.Supp. at 285. Therefore, the Court will not eliminate these hours from plaintiffs' fee application.

### 7. Overstaffing, Excessive Hours, Redundant or Duplicative Work

Defendants argue that there is pervasive evidence that plaintiffs' hours are excessive and redundant, and that they overbilled for court conferences, staff meetings, time spent getting acquainted with the case, and time spent on case preparation. Plaintiffs respond by making several small reductions in their fee request, yet maintain that most of the hours alleged by defendants to be excessive were necessary and compensable. The Court will address each remaining area of dispute in turn.

#### a. Court Conferences

Defendants argue that they should not be required to compensate plaintiffs' attorneys for the practice of sending multiple attorneys and staff to court conferences in which they played no meaningful role. Plaintiffs argue that they divided responsibility for the issues in this case among several attorneys and staff, thereby making the presence of more than two individuals at court conferences necessary. They nevertheless agree to withdraw twenty-one hours billed by Schulte attorneys at conferences in which CRI was lead counsel.

The Court finds that a small reduction is necessary to account for plaintiffs' multiple staffing at court conferences. Although plaintiffs may have deemed it necessary to have several staff members attend conferences, there is some evidence of excessive billing. For example, on June 1, 1998, plaintiffs billed over twenty hours for a court conference that lasted less than three hours. This disparity is attributable to the fact that the conference was attended by five CRI staff members and two Schulte staff members. Having seven attorneys present at one court conference and billing time for each of those present is unreasonable. Therefore, the Court will take this into account when it reduces plaintiffs' fee request.

#### b. Strategy Meetings

Defendants argue that plaintiffs overstaffed internal strategy meetings. Plaintiffs counter that there was no other way to discuss discovery issues, trial strategy, and other matters with a staff as large as the one employed by plaintiffs in this case. The Court agrees with plaintiffs and will not reduce any hours for staffing internal strategy meetings. Although plaintiffs staffed one meeting with sixteen employees and two other meetings with eight employees, the vast majority of the meetings identified by defendants were reasonably staffed considering the number of attorneys involved in the case.

#### c. Time Spent Getting Acquainted With the Case

Defendants point out that of the fifty-six people at CRI who worked on this case, only five of them remained with the case throughout its duration. Defendants argue that they should not have to compen-

sate plaintiffs for the hours dedicated to training new staff members. Plaintiffs agree to withdraw fifty-four hours expended by Schulte attorneys who joined the litigation team shortly before the parties entered into settlement negotiations, but contend that no other reduction is warranted.

■ The Court finds that the excessive amount of turnover at CRI throughout this litigation warrants some reduction in plaintiffs' recovery because it resulted in an inordinate number of hours spent by new staff members learning about the case. Accordingly, the Court will reduce plaintiffs' fee award to account for this excessive time expenditure.

### d. Excessive Hours Spent on Other Tasks

Defendants argue that plaintiffs spent an unreasonable amount of time on the following tasks: motion for class certification (660 total hours including time spent on initial brief, reply brief, and appeal); researching hearsay exceptions (128 hours); applicability of legal standards to named plaintiffs (260 hours); analyzing materials on children in foster care (500 hours); analyzing materials on adoption (500 hours); training (500 hours); protective services work (900 hours); researching issues related to fatalities (1,000 hours); fiscal aspects of the case (800 hours); proposed findings of fact (5,700

hours); reviewing depositions (743 hours); fact-finding from deposition transcripts (351 hours); preparing for depositions (387 hours). Plaintiffs contend that, with the exception of 420 hours spent by paralegals in relation to deposition work which plaintiffs agree to withdraw, each hour identified by defendants was reasonably spent on essential work.

Although this complex litigation surely required thousands of hours of work, after carefully reviewing the contested hours, the Court finds that at least some reduction is warranted. The Court cites as just one example the time spent on plaintiffs' proposed findings of fact. Although the proposed findings of fact were extremely thorough and obviously required a great deal of work, plaintiffs expended an unreasonable amount of time for this activity. Plaintiffs billed 5,700 hours for this work from May 1996 to September 1998. While the Court cannot say precisely how much time this activity should have taken, based on the Court's experience in numerous cases involving issues equally complex to those presented in this case, 5,700 hours over two years and four months is an unreasonable amount of time to spend drafting proposed findings of fact.

■ In addition, the vagueness of some of the time records prevents the Court from determining why plaintiffs were required to expend so many hours on these tasks.[10] Although counsel is "not required

10. In addition to attacking plaintiffs' hours as excessive, defendants contend that 5,912 hours attributable to CRI attorneys and 615 hours attributable to Schulte attorneys are too vague to be compensable. Defendants also contend that 564 of CRI's hours and 1,368 of Schulte's hours should be excluded because the entries associated with these hours commingle several activities making it difficult to evaluate the reasonableness of any of the listed activities. Although defendants characterize these commingled time entries as impermissible "block billing," their argument is really that plaintiffs' entries are vague, i.e., that block billing makes it more difficult to decipher the time entries and determine if the work expended was reasonable. If defendants argued that plaintiffs' hours should be

reduced solely because plaintiffs used block billing, their argument would fail. *See, e.g., Rodriguez,* 84 F.Supp.2d at 425 (stating that "[a]lthough ... block billing makes it more difficult for the Court to determine with precision exactly how much time was spent on each task, the practice of block billing is not prohibited in this Circuit").

In response to defendants' vagueness arguments, plaintiffs agree to withdraw 971 hours attributable to CRI attorneys, but contend that the remaining time entries are sufficiently specific and detailed. It would be impractical for the Court to review each of the remaining thousands of hours worth of disputed time entries to determine whether they are impermissibly vague. Rather the Court has

to record in great detail how each minute of his time was expended ... at least counsel should identify the general subject matter of his time expenditures." *Hensley,* 461 U.S. at 437 n. 12, 103 S.Ct. 1933. If the time records lack such specificity that the court is unable to determine a proper fee allocation, then plaintiffs' fee recovery may be reduced. *See, e.g., Ragin v. Harry Macklowe Real Estate Co.,* 870 F.Supp. 510, 520 (S.D.N.Y.1994) (reducing fees where time entries contained such vague entries as "research for brief," "research and draft brief," and "draft and edit brief"). Of the thousands of hours challenged by defendants, at least some of the time entries are so vague that the Court is unable to determine whether the time was reasonably expended.

Finally, the fact that plaintiffs had so many attorneys working on this case throughout the four years of litigation creates a risk of duplicative billing. The Court will therefore take these matters into account when it reduces plaintiffs' fee award.

## II. Level of Success Achieved in the Litigation

Defendants request that plaintiffs' total lodestar recovery be reduced to reflect what defendants characterize as plaintiffs' limited success. In support of this request, defendants make two arguments: first, that the relief obtained by plaintiffs compared to the relief originally sought warrants a downward adjustment, and second, that plaintiffs could have obtained the same relief much earlier in the litigation.

### A. Whether Plaintiffs Were Successful

■ Defendants first argue that plaintiffs did not achieve a level of success sufficient to justify a full fee award.

Courts have recognized that if a plaintiff is successful in civil rights litigation, i.e., if a plaintiff is a prevailing party, " 'the degree of the plaintiff's overall success goes to the reasonableness' of a fee award." *Farrar v. Hobby,* 506 U.S. 103, 114, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (quoting *Texas State Teachers Ass'n v. Garland Ind. Sch. Dist.,* 489 U.S. 782, 793, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989)). "If ... a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount.... [T]he most critical factor is the degree of success obtained." *Hensley,* 461 U.S. at 436, 103 S.Ct. 1933.

■ Defendants contend that plaintiffs only achieved partial success and therefore, should not recover their full fee request. Defendants point out that

> plaintiffs initially sought ... to take over the entire operation of the child welfare agency—ousting the agency head in favor of a court-appointed receiver to oversee and direct the implementation of all the detailed injunctive relief plaintiffs were hoping to obtain from the court, with the power to restructure the New York City child welfare system.

City Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Attorneys' Fees, at 36 ("Def.Br."). According to defendants, the relief provided for in the City Settlement Agreement is in stark contrast to that which plaintiffs sought by bringing the litigation. The Agreement leaves the control of the child welfare system in the hands of its present managers, without any court-imposed instructions or mandates. While ACS is required to permit inspection of certain of its operations by an independent team of experts which

considered defendants' vagueness argument in connection with their contention that plaintiffs spent unreasonable amounts of time on certain tasks. If the entries proved too vague to enable the Court to determine whether the time was reasonably spent, the Court took this

matter into account when it reduced plaintiffs' fee request. However, the Court did not make any reduction solely because an individual time entry appeared vague if the Court was able to determine that, in general, the time spent on a specific task was reasonable.

may make recommendations about the performance of ACS, ACS may, in its discretion and acting in good faith, choose to adopt or reject the recommendations. Plaintiffs are entitled to return to Court only if the expert panel finds that ACS is not acting in good faith.

By arguing that this distinction between the relief sought and the relief granted justifies a fee reduction, defendants are interpreting the term "success" far too narrowly. While it may be true that plaintiffs did not achieve the precise result that they originally sought, it is clear that they obtained a significant and valuable level of success for children affected by New York City's child welfare system. The litigation has led to institutional reform and improvement of most aspects of ACS's operations. *See Marisol* II, 185 F.R.D. at 164 (recognizing that "the City and State Settlement Agreements touch on almost all, if not all, of the City and State functions involving the New York City child welfare system"). This Court has previously found that the Settlement Agreements are "more favorable than any remedy that could have been imposed by the Court at the end of trial." *Id.* at 165. Even defendants concede that the settlement "is a far better solution than had been originally sought by plaintiffs, since neither receivership nor the type of detailed consent decree originally sought has proven successful in other jurisdictions." Def. Br. at 38.

Given that the litigation has led to the implementation of systemic improvements to the New York City child welfare system, the Court is not prepared to characterize plaintiffs' success as limited merely because they achieved their goal via a different route than they originally hoped for. *See, e.g., Williams*, 975 F.Supp. at 320–21 (finding that plaintiffs achieved

more than limited success even though the consent judgments were not identical to what was originally sought by plaintiffs).[11]

## B. Whether Plaintiffs Could Have Obtained the Same Relief Earlier in the Litigation

Defendants also argue that plaintiffs' fees should be reduced because they could have settled this matter earlier for the same relief, thus avoiding the need for protracted litigation.

The Second Circuit has recognized that "[a] district court should not rely on informal negotiations and hindsight to determine whether further litigation was warranted and, accordingly, whether attorney's fees should be awarded." *Ortiz v. Regan*, 980 F.2d 138, 140 (2d Cir.1992). Nevertheless, courts have reduced fee awards where plaintiffs unreasonably rejected settlement offers and eventually obtained relief which they could have gotten by settling earlier. *See, e.g., Raishevich v. Foster*, 70 F.Supp.2d 411, 415 (S.D.N.Y.1999) (rejecting award of attorneys' fees where plaintiffs refused a realistic offer to settle early in the case); *NAACP v. Town of East Haven*, 44 F.Supp.2d 422, 428–29 (D.Conn.1999) (reducing fee award where judgment was of limited success compared to the relief that was offered before initiation of the lawsuit).

The Court finds that plaintiffs never unreasonably rejected a settlement proposal similar to the one eventually reached by the parties. The first time anything resembling settlement negotiations took place was in April 1997. At that time, ACS Commissioner Nicholas Scoppetta proposed to Ms. Lowry, in the most general terms, ways that the litigation might be

---

11. Defendants argue that under the approach taken by the Court, any plaintiff can claim complete victory by redefining what their goals were after the case has ended even if the result does not resemble what was originally sought in the complaint. This Court disagrees. The Court would certainly not find that plaintiffs were successful in their litigation efforts if defendants did not reform the child welfare system in any material way. But reform has been implemented by defendants and therefore, plaintiffs have achieved their overall goals even if they did so through alternate means.

settled.[12] Commissioner Scoppetta initially suggested that a neutral expert would perform a series of agreed upon tasks, including reviewing a Reform Plan drafted by ACS in 1996 and recommending ways the Plan might be strengthened, reviewing ACS's progress towards achieving the objectives in the Plan, and reporting to the Court on whether ACS was acting in good faith in its reform efforts. *See* Affidavit of Nicholas Scoppetta at ¶ 7 ("Scoppetta Aff."). Ms. Lowry responded that the Reform Plan was not sufficiently detailed to be considered as part of a settlement. Commissioner Scoppetta then told her that defendants would not agree to the type of rigid and prescriptive consent degree originally sought by plaintiffs. *Id.* at ¶ 8.

When the two met again in May 1997, further discussions ensued but neither party made a concrete settlement offer to the other. They simply agreed that Ms. Lowry would draft an outline of what she believed a settlement should look like. *Id.* at ¶ 9. Subsequently, Ms. Lowry sent a draft of her proposal containing terms to which Commissioner Scoppetta immediately objected on the grounds that, in addition to being too rigid and prescriptive, the draft did not contain any of the concepts or ideas contained in his proposal of April 1997. *Id.* at ¶ 10.

Nevertheless, the parties agreed to meet again. At the next meeting, Ms. Lowry explained what an agreement between the parties would have to look like in order for plaintiffs to seriously consider settling the case. Defendants rejected her proposal. *Id.* at ¶ 15.

The next business day, plaintiffs served the City defendants with the motion for an injunction and temporary restraining order in relation to the Laight Street Pre–Placement Center. This action abruptly ended the settlement negotiations between the parties.

Based on these events, the Court finds that plaintiffs never unreasonably rejected a settlement offer from defendants, nor could they have settled this case at an earlier time. Although there was some discussion of terms that resembled what would eventually be embodied in the final settlement agreement between the parties, the discussion was informal at best and did not present any concrete opportunity for ending the litigation. The parties were still considerably far apart at this early stage of the negotiations as evidenced by the fact that neither was willing to consider any portion of the proposals made by the other. Therefore, the Court will not reduce plaintiffs' fee award on this ground.[13]

---

12. The parties filed two affidavits describing settlement efforts in this case. Ms. Lowry filed an affidavit on behalf of plaintiffs and Commissioner Scoppetta filed an affidavit on behalf of defendants. The two affidavits paint substantially different pictures of what happened throughout the settlement negotiations. However, even assuming that Commissioner Scoppetta's version of the events is accurate, the Court would still find that no reduction in plaintiffs' fee application is warranted for reasons that will be further discussed below.

13. The cases relied upon by defendants are distinguishable from the present case. For example, in *Raishevich*, defendant offered to pay $25,000 to settle but plaintiffs wanted $35,000. The court proposed a $30,000 compromise which plaintiffs rejected. They eventually recovered less than the amount proffered in settlement. On these facts and others, the court concluded that plaintiffs were not entitled to any fees. 70 F.Supp.2d at 415. The present case is distinguishable because there was no firm offer made by either party which could be accepted, rejected, or countered. The negotiations never approached a level of finality like those in *Raishevich*, and therefore, it cannot be said that plaintiffs acted unreasonably.

In *NAACP*, the court substantially reduced plaintiffs' fees where plaintiffs rejected a settlement of the dispute before a lawsuit was even initiated for all of the relief eventually obtained. The court found that plaintiffs initiated the suit in order to qualify plaintiffs' attorneys for fees, which they could not have accomplished in a pre-suit settlement. 44 F.Supp.2d at 429. Clearly, there was no such improper motive in the present case.

## III. Calculating Attorneys' Fees

Pursuant to the foregoing discussion of the attorneys' reasonable hourly rates and reasonably expended hours, the Court finds that plaintiffs are entitled to $5,599,775.76 in attorneys' fees. In reaching this amount, the Court first calculated plaintiffs' initial lodestar as follows:

CRI—Non-travel related fees. [14]

| STAFF | HOURLY RATE | x | HOURS EXPENDED | = | TOTAL |
|---|---|---|---|---|---|
| M. Lowry | $375.00 | x | 2,615.40 | = | $980,775.00 |
| R. Firestein | 350.00 | | 1,252.51 | | 438,378.50 |
| J. Kirklin | 350.00 | | 61.20 | | 21,420.00 |
| M. Stone | 350.00 | | 43.80 | | 15,330.00 |
| R. Dahlberg | 300.00 | | 39.40 | | 11,820.00 |
| S. Lambiase | 300.00 | | 192.15 | | 57,645.00 |
| E. Rodriguez | 230.00 | | 100.90 | | 23,207.00 |
| D. Dorsky | 230.00 | | 126.90 | | 29,187.00 |
| M. Peters | 200.00 | | 3,057.88 | | 611,576.00 |
| K. Schiller | 200.00 | | 197.80 | | 39,560.00 |
| C. Levine | 200.00 | | 5,352.90 | | 1,070,580.00 |
| D. Eviatar | 190.00 | | 2,344.30 | | 445,417.00 |
| E. Thompson | 190.00 | | 178.10 | | 33,839.00 |
| R. Park | 150.00 | | 49.70 | | 7,455.00 |
| M. Delone | 150.00 | | 112.50 | | 16,875.00 |
| A. Gilbert | 150.00 | | 51.80 | | 7,770.00 |
| R. Levine | 150.00 | | 58.40 | | 8,760.00 |
| R. Kimura | 140.00 | | 1,096.40 | | 153,496.00 |
| A. Park | 130.00 | | 721.70 | | 93,821.00 |
| S. Nossel | 130.00 | | 1,401.14 | | 182,148.20 |
| Paralegals | 75.00 | | 12,881.28 | | 966,096.00 |
| TOTAL | | | 31,936.16 | ° | $5,215,155.70 |

CRI—Travel related fees.

| STAFF | HOURLY RATE | x | HOURS EXPENDED | = | TOTAL |
|---|---|---|---|---|---|
| M. Lowry | $187.50 | x | 139.59 | = | $26,173.13 |
| R. Firestein | 175.00 | | 27.25 | | 4,768.75 |
| S. Lambiase | 150.00 | | 20.97 | | 3,145.50 |
| E. Rodriguez | 115.00 | | 4.00 | | 460.00 |
| D. Dorsky | 115.00 | | 20.50 | | 2,357.50 |
| M. Peters | 100.00 | | 294.15 | | 29,415.00 |
| K. Schiller | 100.00 | | 3.42 | | 342.00 |
| C. Levine | 100.00 | | 78.86 | | 7,886.00 |
| D. Eviatar | 95.00 | | 49.12 | | 4,666.40 |
| R. Park | 75.00 | | 2.33 | | 174.75 |
| M. Delone | 75.00 | | 0.50 | | 37.50 |
| A. Gilbert | 75.00 | | 12.00 | | 900.00 |
| R. Kimura | 70.00 | | 35.98 | | 2,518.60 |
| A. Park | 65.00 | | 2.08 | | 135.20 |
| S. Nossel | 65.00 | | 38.18 | | 2,481.70 |
| Paralegals | 37.50 | | 130.62 | | 4,898.25 |
| TOTAL | | | 859.55 | | $90,360.28 |

Schulte—Non-travel related fees.[15]

| STAFF | HOURLY RATE | x | HOURS EXPENDED | = | TOTAL |
|---|---|---|---|---|---|
| D. Brodsky | $375.00 | x | 432.70 | = | $162,262.50 |
| J. Velona | 250.00 | | 1,278.10 | | 319,525.00 |
| K. Schiller | 240.00 | | 375.80 | | 90,192.00 |
| A. Freedman | 230.00 | | 637.00 | | 146,510.00 |
| S. Davidson | 150.00 | | 118.50 | | 17,775.00 |
| A. Passanante | 140.00 | | 434.50 | | 60,830.00 |
| E. Schijf | 130.00 | | 659.10 | | 85,683.00 |

14. In their initial brief plaintiffs failed to identify attorneys' travel time. They revised their fee request in their responsive brief and identified certain hours as travel time. These hours will be addressed separately below and will be billed at fifty percent of plaintiffs' regular hourly rate. *See, e.g., In re Agent Orange,* 818 F.2d at 238; *Williams,* 975 F.Supp. at 324.

15. Schulte did not submit time sheets differentiating between travel time and non-travel time. However, it did voluntarily deduct $12,368.50 from its initial request, which it asserts represents the time its attorneys spent traveling. The Court is satisfied with this reduction.

| | | | |
|---|---|---|---|
| M. Craner | 130.00 | 72.20 | 9,386.00 |
| S. Aronowitz | 130.00 | 44.60 | 5,798.00 |
| J. McBride | 130.00 | 152.80 | 19,864.00 |
| M. Alston | 110.00 | 1,381.95 | 152,014.50 |
| K. Brombach | 110.00 | 119.60 | 13,156.00 |
| D. McCracken | 90.00 | 108.80 | 9,792.00 |
| P. Hamlen | 75.00 | 172.10 | 12,907.50 |
| Other Paralegals | 75.00 | 891.00 | 66,825.00 |
| | | | |
| TOTAL | | 6,878.75 | $1,172,520.50 |

LCI—Non–travel related fees.

| STAFF | HOURLY RATE | x | HOURS EXPENDED | = | TOTAL |
|---|---|---|---|---|---|
| K. Freedman | 350.00 | x | 314.10 | = | $109,935.00 |
| TOTAL | | | 314.10 | | $109,935.00 |

Based on these calculations, the Court determined that the initial lodestar amount was $6,587,971.48 ($5,215,155.70 + $90,360.28 + $1,172,520.50 + $109,935.00). The Court then made an across-the-board reduction of fifteen percent, which was determined by considering the time plaintiffs spent exclusively on the case against the State defendants, *supra* section I.B.1, the time spent on non-compensable administrative matters, such as serving and filing papers, *supra* section I.B.2, over-staffing at court conferences, *supra* section I.B.7.a, time spent by plaintiffs' attorneys getting acquainted with the case, *supra* section I.B.7.c, and the excessive time spent on certain other matters, *supra* section I.B.7.d. *See, e.g., Hensley,* 461 U.S. at 438 n. 13, 103 S.Ct. 1933 (approving thirty percent reduction to account for attorney's inexperience and failure to keep contemporaneous time records); *TM Park Ave. Assocs.,* 44 F.Supp.2d at 169 (reducing hours by ten percent to account for insufficiently detailed records and ten percent to account for excessive hours); *Wilder,* 975 F.Supp. at 286 (reducing fee calculations by ten percent to account for vague time entries); *Walker v. Coughlin,* 909 F.Supp. 872, 881 (W.D.N.Y.1995) (reducing total number of hours requested by fifteen percent to reflect inadequate documentation and lower rate of compensation); *Ragin,* 870 F.Supp. at 520–21 (reducing fee request by thirty percent to account for vagueness, duplicative claims, and failure to provide contemporaneous time records); *Meriwether v. Coughlin,* 727 F.Supp. 823, 827 (S.D.N.Y.1989) (reducing fee request by fifteen percent to account for vague entries). Accordingly, plaintiffs' revised lodestar award is $5,599,775.76 ($6,587,-971.48 less fifteen percent).

## IV. Out–of–Pocket Expenses

In addition to attorneys' fees, plaintiffs seek reimbursement for out-of-pocket expenses in the amount of $200,609.70 for CRI and $51,948.52 for Schulte. Defendants have challenged this request on numerous grounds.

It is well-settled that " 'attorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients.' " *LeBlanc–Sternberg,* 143 F.3d at 763 (quoting *United States Football League,* 887 F.2d at 416). Courts have identified the following non-exhaustive list of expenses as those ordinarily charged to clients, and therefore, recoverable: photocopying, travel, telephone costs, and postage. *See id.* (citing cases).

Defendants challenge plaintiffs' expenses associated with court transcripts. Defendants argue *inter alia* that the expenses associated with transcripts of court conferences should be discounted under Local Civil Rule 54.1(c)(1), which states, "[t]he cost of a transcript of court proceedings prior to or subsequent to trial is taxable only when authorized in advance or ordered by the court." According to defendants, plaintiffs cannot recover these costs because they never obtained advance

authorization or a court order. Plaintiffs argue that this provision does not apply to them because it does not apply to expense requests made under § 1988.

Contrary to plaintiffs' argument, § 1988 does not overrule or alter the requirements of the local rule. Local Rule 54.1(c)(1) provides local procedures for implementing Federal Rule of Civil Procedure 54(d)(1), which gives the court discretion to tax the costs listed in 28 U.S.C. § 1920. *See, e.g., Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 441–42, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987) ("Section 1920 enumerates expenses that a federal court may tax as a cost under the discretionary authority found in Rule 54(d)."). The provision of § 1920 most relevant here states, "[a] judge or clerk of any court of the United States may tax as costs the following: ... (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in this case." 28 U.S.C. § 1920(2).

Because § 1920 governs the cost of court transcripts, the Court must follow the procedures governing such costs found in Local Rule 54.1(c)(1) unless another statute or rule permits it to do otherwise. Plaintiffs suggest that § 1988 does just that. The Court disagrees. Nothing in § 1988 explicitly permits the Court to tax costs associated with court transcripts, nor have plaintiffs cited any case that stands for the proposition that § 1988 overrules § 1920 and the rules of procedure with which it operates. *See, e.g., Crawford,* 482 U.S. at 445, 107 S.Ct. 2494 (stating that where costs associated with witness fees was a matter governed by § 1920, "[w]e will not lightly infer that Congress has repealed [§ 1920], either through Rule 54(d) or any other provision not referring explicitly to witness fees").

Accordingly, under Local Rule 54.1(c)(1), the costs associated with transcripts of

court proceedings are not taxable to defendants, as plaintiffs did not comply with the mandates of the local rule by seeking advance authorization or an order of the court. The Court will therefore reduce CRI's expense request by $10,786.63.[16]

■ Defendants also contend that plaintiffs should not recover expenses associated with computerized legal research. It is well-established that "computer research is merely a substitute for an attorney's time that is compensable under an application for attorneys' fees and is not a separately taxable cost." *United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.,* 95 F.3d 153, 173 (2d Cir.1996); *see also Omnipoint Communications, Inc. v. Planning & Zoning Comm'n of the Town of Wallingford,* 91 F.Supp.2d 497, 500 (D.Conn.2000) (denying computerized legal research expenses under local rule); *Fernandez v. North Shore Orthopedic Surgery & Sports Med., P.C.,* Civ. A. CV 96–4489, 2000 WL 130637, at *7 (E.D.N.Y. Feb.4, 2000) (relying on *Merritt Meridian* and denying computerized research expenses in fee request made under Title VII); *Beckford v. Irvin,* 60 F.Supp.2d 85, 90 (W.D.N.Y.1999) (denying computerized legal research expenses under § 1988). Therefore, the Court will deduct $6,408.74 from CRI's expense request and $21.83 from Schulte's expense request.

The Court has considered defendants' remaining challenges to plaintiffs' expense request and finds that they lack merit. Accordingly, defendants are assessed $183,414.33 for CRI's expenses ($200,-609.70–$17,195.37) and $51,926.69 for Schulte's expenses ($51,948.52–$21.83), for a total of $235,341.02.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for an award of attorneys' fees and

---

**16.** The Court reached this number by deducting all charges next to the description, "Southern District Reporters," reasoning that these charges were attributable to transcripts of in-court conferences.

expenses is granted. Defendants are directed to reimburse plaintiffs in the amount of $5,835,116.78 for attorneys' fees and expenses.

It is so ordered.